HART, Appellant, vs. HART, Administrator, Respondent.
HART, Respondent, vs. HART, Administrator, Appellant.

*April 20—May 8, 1903.*

*Contracts: Construction: Partnership: "Use and occupation" of land:
Lease by one partner to firm: Accounting: Taxes and insur-
ance: Repairs and betterments: Executors: Interest: Appeal:
Exceptions.* '

1. Where there is no uncertainty of sense in the language of a
written contract, there is no room for construction, and the
court is not at liberty to add to or take from it.
2. A widow to whom a life estate in a flouring mill had been de-
vised entered into a partnership with her co-executor of the
will, to continue for about fourteen months. She put into the
business the "use and occupation" of the mill property against
the time and skill of said co-executor in managing the busi-
ness, and the expenses, losses, and profits were to be shared
equally. *Held*, that not the widow's life estate, but merely an
estate for years, was put by her into the business, creating
the relation of landlord and tenant between her and the firm.
3. The fact that the widow's life estate had been created by a de-
vise to her of the "use and occupation" of the property during
widowhood, does not make the use of the same phrase in the
partnership agreement significant as showing an intention to
put the life estate into the business.
4. While the court, in a proper case, may look to the acts of parties
under a contract in aid of its construction, their testimony as
to what they understood the contract to mean cannot be re-
sorted to, either to explain or to change it.
5. Where real property used in a partnership business is leased by
the firm from one partner who has a life estate therein, the
taxes and insurance on such property are not properly partner-
ship expenses, in the absence of an express agreement to that
effect, but are chargeable to the lessor.
6. Repairs or betterments put upon the real property in such case
by the firm are not, however, in the absence of express agree-
ment, chargeable to the lessor.
7. A general exception to a finding that an entire account embrac-
ing many items was chargeable to a firm and not to one of the
partners, is not available on appeal as an objection to a few
specific items of such account, no complaint being made as to
the greater part thereof.

8. Upon the death of a testator, his widow, to whom he had given a life estate in all his property, subject to the payment of his debts, etc., entered into partnership with her co-executor of the will, she agreeing to put into the business the use of a certain milling property of the estate as against his time and skill. With the approval of the probate judge, the firm practically assumed the settlement of the estate, taking over the personal property thereof for use in connection with the business, giving the estate credit therefor, and charging disbursements for the payment of estate debts against such credit. The firm also credited the estate with the rental value of the mill property, and charged the same on its books to the widow, because she assumed to put such use into the firm as capital at a time when it was in fact a part of the assets of the estate applicable to the payment of debts. The estate account with the firm was treated as representing primarily the interests of the creditors of the estate, and secondarily the interests of the widow. After the settlement of the estate in this manner, in an action by the widow for an accounting and settlement of the partnership affairs, the trial court, in adjusting the accounts, gave the widow credit for the rent of the mill property which had been charged to her, and charged the same back against the estate. Thereby the estate was found to be indebted to the firm, when in fact the balance was the other way. The indebtedness so found was then treated as a loss to the firm, and defendant was charged with one half thereof. *Held*, an error prejudicial to the defendant, and that the account should have been adjusted on the basis of giving the estate credit for the rent and charging the same to the widow, as was originally done.

9. Except under special circumstances, interest is not to be allowed upon partnership accounts as between partners, in the absence of an agreement to the contrary.

10. In an action for dissolution of a partnership and for an accounting, where the evidence disproved charges of fraud made against the defendant and showed no reprehensible fault on his part, but that the doubt and difficulty which caused the expense of the litigation were attributable to illegitimate claims of the plaintiff as much as to such claims by defendant, it is *held* that there should be a division of costs between the parties.

APPEALS from a judgment of the circuit court for Racine county: FRANK M. FISH, Circuit Judge. *Modified and affirmed.*

This action was commenced February 17, 1896, for the dissolution of the firm of John S. Hart & Co., and for an accounting by the managing partner, John S. Hart, of the entire business of the copartnership running from October 22, 1865, to the time of the trial, and for payment of the balance found due.

It appears from the record that October 17, 1865, Joshua W. Hart died leaving his widow, the plaintiff, and some small children, and also leaving a last will and testament which he had executed two days prior to his death, and which was admitted to probate a few weeks after his death, in and by which he directed, in effect, that all his just debts should be fully paid out of his personal estate as soon as might be after his decease; that the plaintiff herein should have the use, occupation and enjoyment of all his estate, personal, real and mixed, of every name, nature and description during widowhood—subject to the support, maintenance, and education of his children, as therein provided, and he therein nominated and appointed his widow, the plaintiff in this action, and his brother, the said John S. Hart, as executrix and executor of his last will and testament; that they thereupon qualified as such and took possession of the property of the estate; that such estate at the time of the death of Joshua W. Hart consisted of a certain flouring mill, and also of the warehouse building used in connection therewith, situated on the premises described—which flouring mill was operated by steam power and was equipped with the necessary machinery for carrying on the flouring business and in which Joshua W. Hart, deceased, had, for several years, carried on the general business of milling and the manufacture of flour, and such premises were appraised at $20,000, including the flouring mill and elevator thereon; that he also had a homestead described, and a dwelling house and barn thereon, appraised at $3,000; that he also had personal property inventoried and appraised at $25,841.58, including $88.43 not collected, and

$450 personal property selected by the widow pursuant to the statute; that the amount of such personal property, so appraised, included life insurance made payable to the plaintiff, of $4,877.62; that at the time of his death there were claims due from his estate amounting in the aggregate to $25,680.93. October 22, 1865, being five days after the death of Joshua W. Hart, the plaintiff and John S. Hart, both being executors of the will of the said Joshua W. Hart, deceased, as mentioned, entered into written articles of copartnership, wherein and whereby they agreed to conduct the milling, flouring and grinding business at and in the mill, warehouse and appurtenances mentioned, from that day until January 1, 1867, in the firm name of "John S. Hart & Co." upon the terms following, that is to say, the plaintiff, *Cynthia C. Hart,* thereby "puts into said business the use and occupation of the grist and flouring mill . . . with the machinery, fixtures and appurtenances thereto, and with the office furniture, scales, safe and all other movable appliances" then "used in said business and the warehouse and office . . . with the fixtures and appurtenances thereto, and the said John S. Hart puts in his time, labor, skill and attention against the occupation and use of said mill and warehouse, as aforesaid; that said parties agree to pay and stand each one half of all expenses of conducting said business and shall each have and receive one half of the profits and bear and pay one half of the losses of said business;" and in pursuance of such agreement the plaintiff did put in such use and occupation, and John S. Hart did put in such time, labor, skill and attention. That agreement was, by express written agreement, continued to January 1, 1868, and said partnership business was in effect continued until February 5, 1876, when the milling building and all the machinery therein, together with a large part of the wheat, flour, and stock on hand, belonging to the copartnership, were destroyed by fire, in consequence of which the said business was discontinued.

September 14, 1868, the said executors presented their account up to that date, and John S. Hart, as one of them, petitioned the court to be allowed to resign his trust and be discharged therefrom, and upon due hearing thereof their account to that date was approved and allowed as his final account to that date, and he was thereupon, by order of the court, discharged from his trust as such executor, and it was further ordered that the plaintiff remain the sole executrix of the will, and she thereupon gave a new bond in the sum of $8,000. After the destruction of the mill property, February 5, 1876, John S. Hart, for the purpose of collecting the assets of the firm—consisting in part of claims against insurance companies and in part of outstanding book accounts and other choses in action against various customers of the firm, retained possession of the current books of account down to a year prior to the commencement of this action. During that time the plaintiff failed to examine into the state of the account, and the condition of the partnership remained unsettled and was still unsettled. Among other things there was a claim against the Globe Insurance Company for insurance in litigation and undetermined.

April 21, 1894, there was a final accounting by the plaintiff as executrix, and after due hearing she was discharged.

The issues formed by the complaint and answer were, on December 15, 1897, by the court referred to Charles H. Lee, as referee, to hear, try and determine, and to take and state an account between the partners, of their partnership business, and to report his decision, together with the testimony by him taken, and the account so stated. November 25, 1898, the referee made his report and findings, and in addition to the facts stated, which were either found by him or admitted, he found in effect (6) that the business was on the whole profitable; that during the first two years and before the funds of the estate were wholly withdrawn from the business the net profits of the firm were upwards of $30,000; that

after making proper deductions for their losses by the fire the aggregate net profits of the business during the continuance thereof amounted to $42,030.52; (7) that John S. Hart had kept the books and attended to the entire business; that he made such repairs and improvements upon the mill property as he deemed necessary for the successful prosecution of the business; that he expended for repairs and improvements a large amount of money and paid for the same out of the funds of the firm—rarely consulting the plaintiff—that he caused the mill building and the warehouse and the property therein to be insured and paid the premiums upon such insurance and also the taxes upon all of said property out of the partnership funds, and generally managed and controlled everything pertaining to the business, (9) without being called to account by the plaintiff; (10) that the debts of the copartnership had all been paid in full; (11) that no account of such partnership business had ever been rendered by the managing partner to the plaintiff, and no account or settlement of the business had ever been had between them, but that all matters pertaining to the partnership business appeared upon the firm books kept by John S. Hart; (12) that out of the profits plaintiff had received $12,552.91 and no more, while John S. Hart had received out of the said profits $29,477.61; that is to say, the plaintiff had received $8,462.35 less than her share upon such accounting, and John S. Hart had received $8,462.35 more than his share upon such accounting; (13) that except $167.04 subsequently received at intervals from small collections, the entire excess was so drawn out by John S. Hart prior to January 1, 1877, and some of it was invested by him in good interest-bearing loans and he had at all times since been receiving whatever interest, income and profits which may have accrued thereon, but that he was not guilty of any intentional wrong, or any fraudulent conduct or intentional concealment; (14) that in keeping the partnership books John S. Hart improperly

charged to the account of the plaintiff, without her knowledge or consent, numerous items of expense for repairs to buildings, repairs and renewals of machinery, for new and improved machinery installed in the mill to improve the quality of the flour and enable them to compete with other millers, and also for insurance, taxes and other expenditures properly chargeable to the firm; that December 31, 1876, John S. Hart transferred bodily to the debit side of the plaintiff's capital account several entire accounts appearing upon the books under the heads of "Building," "Machinery," and "Permanent Repairs," and made up of such expense items of the copartnership, together with the entire debit balance of an account kept by the firm with the estate of Joshua W. Hart, thereby making it appear that the plaintiff was indebted to the firm when in fact the firm was largely indebted to her, and the referee also stated the true account between the partners as a part of the report; (15) that the only capital contributed by either partner to the copartnership was the interest in the mill property contributed by the plaintiff; that by the payment of the insurance on the mill building to the plaintiff—there having been no actual conveyance of her title to the firm—said capital was fully returned to her and so is not included in the account; (16) that with the exception of the balance of account due from the estate of Joshua W. Hart, the legality of which is doubtful and which may be barred by the statute of limitations, and the claim of the firm against the Globe Insurance Company in litigation, all the assets of the copartnership have been converted into money; that neither of these two items is included in the account, and that any collection of the same would constitute an additional profit; (17) that the allegations of the complaint are all true, except the charge of fraud and concealment, and the amount due the plaintiff from John S. Hart.

And as conclusions of law the referee found, in effect, (1) that the copartnership should bear all such expenses as

taxes and insurance upon buildings, repairs of buildings and machinery, and renewals and new machinery, as well as the ordinary daily operating expenses—and this independent of the question whether, in strictness, the plaintiff's entire life estate was put into the venture, so as to become partnership property, or not; (2) that there was due from John S. Hart to the plaintiff upon a correct statement of the partnership accounts $8,462.35, with interest from November 25, 1898; (3) that the plaintiff was entitled to judgment for the dissolution of the firm and for the recovery of the sum last stated, together with the costs of the action, and that the uncollected accounts and choses in action of the firm should be sold in such manner as the court should direct and converted into money, or that a receiver be appointed with the usual powers to collect the remaining assets, and if collected to divide the same.

November 1, 1899, the court, after full hearing, modified the report and findings of the referee by charging up to the plaintiff the amount .paid by the firm for insurance on the buildings and also the amount paid by the firm for taxes on the real estate, and also the amount expended by the firm in reconstructing one of the buildings after being destroyed or damaged by fire in 1873, and also modified the report by deducting the amounts credited to the firm for moneys received from insurance in payment of losses by fire, by way of rebates on insurance premiums, all of which said items the referee was directed to charge or credit, as the same might be, to the plaintiff instead of the firm.

Thereupon the referee restated the account and found that the amount due the plaintiff from John S. Hart was $3,710.02 with interest thereon from November 25, 1898, instead of the amount previously reported, and the report so modified was in effect confirmed by the court and judgment entered thereon accordingly May 15, 1900. February 7, 1901, John S. Hart died intestate, and thereupon the defend-

ant, *Sands M. Hart,* was duly appointed administrator of his estate.

The plaintiff appeals from so much of the judgment as charges up to the plaintiff and credits the firm with $1,059.63 paid by the firm on building account for reconstructing one of the buildings destroyed by fire in 1873, and also $5,074.45 paid by the firm on account of insurance on the mill and warehouse, and also $3,370.57 paid by the firm on account of taxes on the mill and warehouse, and also, in so far as is adjudged that plaintiff is not entitled to interest on the balance due her from and after February 1, 1877, to November 25, 1898. The defendant appeals from the whole of said judgment.

For the plaintiff there was a brief by *Cooper, Simmons, Nelson & Walker,* and oral argument by *J. B. Simmons.*

For the defendant there was a brief by *Hand & Hand,* and oral argument by *E. B. Hand* and *W. C. Palmer.*

MARSHALL, J. Much unnecessary labor by counsel has been put upon this case from the outset to the present time by failing to recognize and give effect to the terms of the plain contract whereby the mere use of the mill property was contributed by plaintiff as her share of the capital of the firm of J. S. Hart & Co., and confusing the simple questions governing the accounting between the members of the firm, and the questions governing the incidental settlement of the account between the lessor of the mill property and the lessee, with numerous questions governing the settlement of the estate of J. W. Hart and the relations of plaintiff to such estate and to the mill property as life tenant. What the duties of the plaintiff were to the remainderman as regards the mill property, or what the duties of plaintiff and John S. Hart, as executors of the last will and testament of J. W. Hart, deceased, were, is not involved here, at least to such an extent as to require discussion thereof, or even mention

further than may be necessary to show where the property came from that was put into the firm business, how it was disposed of, and how the peculiar manner of such disposition came to be adopted, and how the same should be charged and credited in the partnership accounting.

The first question in the natural order of things is, What were the relations of the partnership to the plaintiff under the partnership agreement? By its terms she 'put into the partnership business the use and occupation of the gristmill, with the machinery, fixtures and appurtenances thereto, and with the office furniture, scales, safe and all other movable appliances in use in connection therewith, also a certain warehouse, against J. S. Hart's time, labor, skill and attention in conducting the business of the firm, the parties to share equally in the expenses of conducting the business and in the profits, and to bear equally the losses thereof,' the partnership relations to last from the date of the contract, October 22, 1865, till the 1st day of January, 1867,—a very plain, simple contract indeed. Plaintiff's counsel claim that under it the firm became, to all intents and purposes, the owner of the mill property; that as regards the questions material to this case such paper was in effect a conveyance to the firm the same as if plaintiff had put the property into the partnership venture by deed in due form. Now to our minds the contract is not ambiguous in any sense, therefore we cannot legitimately apply thereto the rule of practical construction for which plaintiff's counsel contends, or any other rule of construction; though we will say in passing that if rules of practical construction were to be applied they would work out far different results from those for which the learned counsel contend.

No principle is better understood than the one that the meaning apparent upon the face of an instrument, taking the words in their literal sense and as applicable to the subject-matter involved, no absurdity or contradiction appearing,

must be taken as that of the parties, intended by them to be embodied therein; and that courts in dealing with the contract are not at liberty to add thereto or take therefrom. *Boyle v. N. W. Mut. R. Asso.* 95 Wis. 312, 70 N. W. 351; *Johnson v. Pugh,* 110 Wis. 167, 85 N. W. 641. That rule is as old as judicial construction. It is found phrased in the books in a great variety of ways, according to the notions of the authors and judges, but they all come down to this: Where there is no uncertainty of sense there is no room for construction. There is no such uncertainty in the contract in question. Under it (1) plaintiff put the use and occupation of the mill property, as it was at the date of the agreement, into the firm business for fourteen months and nine days, against the time and accomplishments of J. S. Hart to manage the business; (2) the parties agreed to share equally in all the expenses, losses and profits of the business. The use and occupation of the mill plant was contributed by plaintiff, not the mill plant itself. One would have to twist the words used in making such contribution radically out of harmony with their plain, ordinary meaning to hold that she put in the property instead of the use of the property. There can be no mistaking the meaning of the term "use and occupation" in such a paper,—one merely dealing with real estate for a short term, creating at most an estate for years. In a correct legal sense the very idea of use and occupation of realty for less than a life, distinct from the legal title thereof, is that the holder of the latter is the landlord and the grantee of the use a mere tenant, with or without a specific agreement as to a rent charge. *De Pere Co. v. Reynen,* 65 Wis. 271, 22 N. W. 761, 27 N. W. 155; 18 Am. & Eng. Ency. of Law (2d ed.) 263, 269; 2 Taylor, Landl. & Tenant, 236; 2 Woodf. Landl. & Tenant, 538. If there could be any manner of doubt as to whether the term "use and occupation" was used in that sense, that doubt would be easily solved by the fact appearing upon the face of the paper that the arrangement be-

tween the parties thereto was only for about fourteen months, a time so short as to be entirely inconsistent with the idea that plaintiff intended to put her life estate into the venture. Again, under the circumstances the phrase under discussion was strictly appropriate to the situation the parties purposed solving by the formation of the partnership, as clearly shown by the evidence,—the payment of claims against the estate of J. W. Hart, without resort to the real property other than the use and occupation thereof, a reasonable rent charge therefor, which under the statute was applicable to that purpose by the personal representatives of the deceased and with which they were chargeable. Secs. 3823, 3923, Stats. 1898. As the whole estate belonged to plaintiff, conditionally, for life, subject to the title of the personal representatives to the personalty and to the value of the use and occupation of the realty for payment of claims against the estate and the expenses of executing the will, and subject to the further contingency, which she was interested in guarding against, that her conditional life estate in the realty might be invaded to pay claims of creditors, it was most natural that she should have, in form, in a personal way, contributed the use and occupation of the mill plant to the partnership business, and that by an understanding with the probate court the rent value thereof should be charged to her and credited to the estate, where it in fact belonged, just as was done. In that situation no more appropriate language could probably have been selected by the parties to express plainly in a few words just what they intended, i. e., that what belonged to plaintiff subject to the contingency of its being needed in the settlement of the estate, and to the estate subject to the contingency that it might not be needed for the purpose of settling the same and would then go over to plaintiff, the use and occupation of the mill plant for a brief period should be contributed to the firm business, that necessarily to be conducted in such a way as to protect all the primary and secondary interests of

plaintiff, and the personal representatives of the J. W. Hart estate as well.

Much significance is attributed by the learned counsel for plaintiff to the identity of language in the will of J. W. Hart used in devising the mill property to her, with that used in the partnership contract in describing her contribution to the partnership venture, in that the words "use and occupation" were resorted to in both cases. We are unable to give to that the force which counsel urges. In the will the unmistakable purpose was to devise to plaintiff a conditional life estate in all the property, real and personal, of which the testator died possessed. In such an instrument mere form of expression does not control the manifest purpose voiced by the instrument when read as a whole. That may be, perhaps, properly said of any written instrument, but more emphatically as to wills than to written instruments in general.

It would hardly need discussion, we should say, to demonstrate that, merely because the grant of the use and occupation of realty by will creates a life tenancy with a present legal title to support it, it does not follow or even suggest that permission to use and occupy realty for a brief time certain creates an estate or tenancy of the same character. The one is a freehold estate classed as real property, strictly so called, with the relations and duties of life tenant to remainderman, while the other is a chattel real, an estate for years, with the conventional relations and duties of landlord and tenant. "The active manifestation of these estates," it is said, speaking of the latter estates, "is in the conventional relation of landlord and tenant or lessor and lessee." Rice, Real Prop. § 33; 1 Washb. Real Prop. (5th ed.) 76. The distinction between a life estate in realty and an estate for years, the relations between life tenant and remainderman and those between landlord and tenant, we will not stop here to discuss, believing that, in a general way at least, they are too well understood to need more at this time than to be mentioned to

clearly indicate that use and occupation for life signifies one kind of an estate with relations and duties peculiar thereto, and use and occupation for a definite time signifies a mere term for years or less and the conventional relation of landlord and tenant with duties peculiar thereto.

Applying what has been said to the contract of partnership before us, the relation of landlord and tenant between plaintiff and the firm of J. S. Hart & Co. is discovered at once. Applying it to the will of J. W. Hart, if need be, and the relations of life tenant to remainderman are as readily discovered. As the duties of one give no key to the duties of the other, the similarity of the phrase used in one instance to that used in the other has no significance whatever.

Having determined the relations of the firm of J. S. Hart & Co. to the mill property, the various questions presented upon both sides as to the manner the court stated the account between the members of the firm are not difficult of solution. We will now take up the same in detail.

The first two complaints made by the plaintiff are governed by the same principle and will therefore be considered together.

1. The expenditures made by the firm for taxes and insurance on the mill plant were held by the trial court to be chargeable to plaintiff. It is insisted that those expenses should have been charged to the partnership, first, because the life tenancy of the plaintiff was put into the business of the firm; second, because the taxes and insurance on the mill property were proper expenses of the business of the firm, which it was expressly stipulated should be borne by the parties equally. The first proposition is supported by the learned counsel for plaintiff by construing the partnership contract as a transfer of the plaintiff's life estate to the partnership. We have already treated that adversely to counsel's contention. The second contention, it would seem, must fall with the first. The claim that the firm became liable to

keep down taxes and to keep up insurance as a life tenant of the property involves an admission that if the firm acquired only the interest of a term for years, without specific agreements as to duties to be performed, those duties do not include the payment of taxes and insurance. It is one of the distinguishing characteristics between the duties in the one case and those in the other that in the former the tenant must keep down charges upon the property, such as taxes and insurance, while in the latter those burdens are carried always by the landlord, in the absence of some special agreement to the contrary. The lessee is never liable for taxes, insurance or interest on incumbrances unless such liability forms the subject of express stipulation. These are matters entirely within the scope of the landlord's obligations. A lessee is liable for taxes only if he so specially covenants. *Shepardson v. Elmore,* 19 Wis. 424. If without such covenant he is required to pay the taxes, either by law or to protect his leasehold, he may deduct the same from the rent or recover the expense of the landlord by action. The life tenant, however, where there is no covenant or provision to the contrary, must keep down all charges upon the property necessary to preserve the same for the remainderman. *Phelan v. Boylan,* 25 Wis. 679; Wood, Landl. & Tenant (2d ed.) 139, 954, 968; Taylor, Landl. & Tenant (5th ed.) §§ 318, 341.

But, says the learned counsel, if it be conceded that the effect of plaintiff's contributing the use of the mill plant as her part of the partnership capital was to create the relation of landlord and tenant, it does not necessarily follow that the taxes and insurance did not become a legitimate expense of the firm business within the meaning of the partnership contract. True, they became such if that was the intention of the parties thereto, with this modification of counsel's statement, that nothing short of clear evidence, within the rules of law on the subject, will establish such intention. There is no such agreement shown in this case. The only

agreement between the parties was embodied in the partnership contract. That is entirely silent on the subject. The use of the general language requiring the parties to share equally the expenses of the business only carried into the contract the obligation that would have existed by implication without any mention of it.

Not only the language of the contract but all the operations under it show that one member of the firm at least had no idea that taxes and insurance on the mill plant were legitimate firm expenses. The firm took credit for the expenditures for such purposes as they were made, from first to last, and such treatment thereof was disturbed upon the hearing before the referee by adopting the view now urged as to the meaning of the partnership contract, basing such adoption in part on evidence of *Mrs. Hart* as to how she understood the paper. The court, in a proper case, can look to the acts of parties under a contract in aid of its construction. It cannot do so when the contract is perfectly plain. An attempt then to construe is in fact an attempt to change. *Travelers' Ins. Co. v. Fricke,* 94 Wis. 258, 68 N. W. 958; *S. C.* 99 Wis. 367, 74 N. W. 372, 78 N. W. 407; *Milwaukee Co. v. Isenring,* 109 Wis. 9, 27, 85 N. W. 131; *Minnesota S. Co. v. McCrossen,* 110 Wis. 316, 321, 322, 85 N. W. 1019. Probably no rule is better understood than that the opinions of the parties to the contract as to what they took it to mean cannot be resorted to, either to explain or change it. *Boden v. Maher,* 105 Wis. 539, 81 N. W. 661; *Johnson v. Pugh,* 110 Wis. 167, 85 N. W. 641; *Milwaukee C. Asso. v. King F. & M. Co.* 112 Wis. 647, 88 N. W. 598; *Northern T. Co. v. Snyder,* 113 Wis. 516, 89 N. W. 460.

Counsel for plaintiff make the suggestion that only the net use of the property was put into the firm business, which argues that it was not supposed she would be required to pay any insurance burdens. It is not easy to understand how the firm could have enjoyed the net use unless some one else

paid the difference between that and gross use. A landlord grants his tenant net use, and for that reason is charged with taxes and insurance. When it is admitted that the net use was contributed, it is not perceived why complaint is made because the contributor is charged with taxes and insurance. The argument of the learned counsel seems out of harmony with his assignment of error. That appearance is not changed by his illustrative authority. *Helmer v. Yetzer,* 92 Iowa, 627, 61 N. W. 206. There the firm of A., A., G. & Y. contracted with H. to buy live stock for them, the understanding being that the latter should be allowed, as compensation for his services, one half of the profits that might accrue to Y. as a member of the firm. The business was conducted by the use of borrowed money. Interest thereon was charged as firm expense, thereby affecting the profits to be distributed. It was held that the manner of charging the interest was proper, as it was a part of the legitimate business expense of the firm, and that H. could not stand in any better position than Y. It was suggested in support of the contrary view that the firm might as well have charged up to expense rent upon their packing house, but the court said obviously not so, because whereas the firm borrowed the money for use it did not rent the packing house; it owned the same. Applying that to this case, whatever was necessary to carry the burdens incident to what the firm owned was legitimate firm expense. As the firm owned only a leasehold interest in the mill plant,—the mere use thereof free from tax and insurance burdens,—the expenses of carrying such burdens belonged to the plaintiff, the landlord.

2. The next complaint of the plaintiff is because she was charged the expense of constructing a new building in place of one that was burned down. Since in the plan of accounting embodied in the judgment she was given the benefit of the insurance money received on account of the burned structure in excess of the expense of the new one, we see no reason

why this subject needs attention. We do not understand that the assignment of error covering the same was presented for serious consideration except in the event of its being held that the insurance account should have been charged to the firm. As we hold otherwise, it is not material how the insurance money and the new building account should, strictly speaking, have been handled, since in the final result plaintiff, while being charged with one was credited with the other, and so was not harmed.

3. On defendant's appeal error is assigned because expenditures for repairs, other than those incident to operating the mill as it had been customarily operated immediately before the firm took possession thereof, were not charged to the plaintiff as betterments. To support the contention that they should have been so charged, counsel cites *Braun's Appeal,* 105 Pa. St. 414; *Dunnell v. Henderson,* 23 N. J. Eq. 174; *Goepper v. Kinsinger,* 39 Ohio St. 429; *Warren v. Raben,* 33 Neb. 380, 50 N. W. 257. Very many authorities of that kind might be mentioned, but it will be seen they do not support counsel's proposition. The first case is to the effect that in keeping partnership accounts, where the amount the managing partner is entitled to receive for services is contingent upon net profits, expenditures for betterments should be charged to the appropriate property accounts as part of the partnership capital and not to gross income. The question of whether expenses upon leased property should be charged to the lessor was not even remotely involved, nor any similar question. In each of the second and fourth cases there was an express agreement involved, covering the subject of charging repairs and betterments to the landlord. In the third case the question was whether improvements of a permanent character, put upon leased property by a partnership lessee, such premises being the property of a member thereof and there being no proof that the firm paid for such improve-

ments, should be deemed partnership property as to creditors of the firm, and the decision was in favor of the lessor of the premises. Plainly that does not touch the question here presented.

Now this familiar rule seems to foreclose defendant from any reasonable ground to complain because the repair account, permanent improvement account, and fixed machinery account were not charged to plaintiff: A tenant, in the absence of some clear agreement to the contrary, is conclusively presumed to have taken the leased property and agreed to enjoy it, as regards claims upon the landlord, as it was when the tenancy commenced. If he makes any additions, by way of fixtures or otherwise, to the property during the tenancy, in order to improve the value thereof for his use, regardless of whether a permanent addition to the value of the freehold or the landlord's interest in the property results, without some agreement to the contrary, binding upon the landlord, the benefit after the term goes to the landlord without compensation to the tenant, unless the additions to the property are such that they can be removed during the tenancy without injury to the realty, and they are so removed. After possession of the property by the tenant ceases he cannot, without the landlord's consent, re-enter to remove therefrom any additions made thereto by him, and in the event of his removing any such additions during the existence of the tenancy to the damage of the realty he is liable therefor. *Fitzgerald v. Anderson,* 81 Wis. 341, 51 N. W. 554; *Platto v. Gettelman,* 85 Wis. 105, 55 N. W. 167; *Josslyn v. McCabe,* 46 Wis. 591, 1 N. W. 174; *Second Nat. Bank v. O. E. Merrill Co.* 69 Wis. 501, 34 N. W. 514; *Keefe v. Furlong,* 96 Wis. 219, 70 N. W. 1110; *Mueller v. C., M. & St. P. R. Co.* 111 Wis. 300, 87 N. W. 239; *Kelley v. Border City Mills,* 126 Mass. 148; *Taylor v. Townsend,* 8 Mass. 411. There being no claim here that there was any express agreement of plaintiff to pay

for repairs or betterments put upon the mill property by the firm, or any agreement at all in fact on the subject, the accounts under discussion were not properly chargeable to her.

4. Attention is called in the brief of counsel for defendant to a list of items aggregating $512.02 gathered from the repair account of $4,829.01. We are unable to find that there was any specific exception taken to the findings as to such items, and therefore objections to the court's treatment thereof cannot be considered. The exception goes to the entire account of $4,829.01 and all the items therein, while no complaint is made as to the greater part thereof. If it was desired to preserve an exception to a few items in the account, or any number of items less than the whole, the balance being admitted to be correctly charged, an objection should have been taken specifically pointing out the particular items objected to. *Warner v. Cuckow,* 90 Wis. 291, 63 N. W. 238; *Bailey v. Costello,* 94 Wis. 87, 68 N. W. 663; *Ingersoll v. Seatoft,* 111 Wis. 461, 87 N. W. 460. The general exception covered the controversy as to whether the account as a whole was chargeable to the firm. That is all.

5. Complaint is made because items charged against plaintiff upon the books of the firm, aggregating $10,000, for rent, and credited to the J. W. Hart estate account, were held to have been improperly so charged and credited and were accordingly cross-entried, plaintiff being given credit and the J. W. Hart estate debited. The undisputed situation seems to be this: Plaintiff at the outset assumed the right to turn the use of the mill plant over to the firm of J. S. Hart & Co., though the value of such use, in fact, for the time being, was an asset of the estate in the hands of the personal representatives of J. W. Hart, for the purpose of paying claims allowed against his estate. Secs. 3823, 3923, Stats. 1898. Under those circumstances, obviously, the only way she could have rightfully put the use of the mill plant into the firm as she did, was either to herself pay the value of the

use to the estate, or have the firm pay it for her account. It was deemed best for her interests and for the interests of the estate that the mill business should be continued, and that the personal property of the estate in use and for use in connection with such business should be taken into the firm and credited as fast as available as cash assets and to have the firm assume the payment of the estate debts, charging disbursements in that regard against such credits. That way of handling the settlement of the estate, though somewhat irregular, was entered upon and pursued to the end in good faith with the approval of the probate judge and to the evident advantage of plaintiff. The personal estate of J. W. Hart, deceased, thereby became, in effect, firm property, and was used for the legitimate purpose of settling the estate. The estate account was merely a convenient conduit through which to put the matters of debit and credit which actually should have been kept by the executors as matters entirely separate and distinct from the firm in form as well as in fact. They were so kept in effect. All available assets of the estate applicable to the payment of claims against it, including the value of the use of the mill plant at $2,500 per year, were credited to the estate upon the books of the firm, plaintiff being charged with the rent because the use of the mill plant had been appropriated by her as part of the firm capital, while the same was an asset in the hands of the personal representatives of J. W. Hart for the payment of debts against the estate. It was necessary under the circumstances, it will be readily seen, to handle the matter as it was handled in order that the rentable value of the property might be set aside for use so far as necessary for legitimate estate purposes. The county judge was a party to the plan adopted, and it was executed with his approval, as we have said. While plaintiff was charged with the rent, since she was to all intents and purposes the owner of the estate, subject to the allowed claims against it and the expenses of executing the will, she got the

full benefit of every dollar of the debit charges by a cor-
responding credit in the estate account. Mr. Hart testified
that his understanding was that everybody concerned was sat-
isfied with the matter, and, as to the county judge, that he
directed that the value of the use of the mill plant should be
set aside as it was; that the estate account was treated as rep-
resenting the interests of creditors of the estate primarily,
and secondarily those of *Mrs. Hart,* so that when she was
charged in one account she was in effect credited in the other.
After the absolute time allowed by statute for settling the es-
tate, application was made to the probate court for an exten-
sion of time to pay allowed claims, in which plaintiff joined,
showing that the income of the mill property for such pay-
ment was being made available at the rate of $2,500 per year.
The additional time petitioned for was allowed on the show-
ing so made. On that state of the case we are unable to per-
ceive upon what legal or equitable principle it was found
necessary or proper to take the rent charge out of the plaint-
iff's account as it appeared upon the books of the firm and
charge the same back to the estate account. We may reason-
ably assume that it would not have been done if the effect
hereafter noticed had been appreciated. The income of the
property belonged just where it was originally placed, since the
mode of handling the estate matter met the approval of the
county judge. Every dollar of the value of the use of the prop-
erty, it will be easily seen, in the manner the account was kept,
was bound necessarily, in the end, to reach the proper
owner,—to go to the creditors of J. W. Hart or to pay the ex-
penses of executing his will primarily and if required for that
purpose, otherwise to go back to plaintiff. After the whole
affair as to every one interested in the estate, except plaintiff,
was closed, it was manifestly wrong to charge and credit
back the rent,—to thereby bring the estate in debt to the firm
whereas it was in fact in credit, and to then treat the debit

balance against the estate as a loss to the firm whereas there was ample property of the estate to pay the debt. The prejudice in this to J. S. Hart will be made to fully appear in what follows.

6. By the trial court's corrections of the accounts of the firm, when they were ready for closing and striking a final balance as between the parties thereof, there was a debit balance against the estate of J. W. Hart of $3,320.97. That was created, as before indicated, by charging the estate account with the items of rent aggregating $10,000 and crediting the same to plaintiff. If there was in fact the sum of $3,320.97 due the firm from the estate and it had been known before the final closing of the estate, it could readily have been collected. It undoubtedly would have been collected, thereby, by so much, reducing the property which ultimately came to the possession of the plaintiff. Before such indebtedness, so called, was brought to light by the peculiar system of accounting adopted by the referee and sanctioned by the court, the entire residue of the estate property had passed to the possession and enjoyment of plaintiff. The effect of closing the debit estate account by charging the same to profit and loss resulted, necessarily, in increasing plaintiff's ultimate credit balance by half of the charge, and increasing J. S. Hart's debit balance by a corresponding amount. That is, instead of the whole amount of the indebtedness of the estate coming to the firm as a cash asset from the property of the estate, it was needlessly treated as a loss and Mr. Hart was made to bear half of it. Defendant very properly complains of that. In our judgment it does not admit of serious discussion that the debit balance credited against the estate by the system of accounting in the court below was wholly fictitious; that the disposition of the same was made either through a misconception of the legal and equitable rights of the parties or of the prejudicial effect thereof upon Mr. Hart,

and possibly of both. The debit balance should be restored and then paid out of the item of rent which should be charged back to plaintiff and credited to the estate account. The method adopted, of turning an asset of the firm into a loss at the expense of one member of the firm and a gain to the other, is strongly illustrative of the care that should be taken in settling partnership accounts.

Objection is made to a credit of $450 to plaintiff. That is claimed to have been an arbitrary reduction of her debit balance to the firm. The suggestion is made that it represents the amount of the separate inventory of allowances made to plaintiff in the settlement of her husband's estate. No intelligent explanation has been given why it should be considered that plaintiff directly or indirectly delivered to J. S. Hart & Co. the special allowance made to her out of her husband's estate, or why it should be considered that, if she did, she did not at the time receive the proper credit. If she put that property into the firm it seems she must have got credit for it. If she did not put it into the firm she is not entitled to credit for it merely because she and her associate executors were responsible for the assets of the estate. In no way that we can imagine could the estate be legitimately brought into debt to plaintiff on account of that matter. Counsel for defendant say there is nothing in the record to justify the court's action, and counsel for plaintiff fail to point out any warrant for it or even to make a suggestion which to our minds, if true, justifies it.

Further objection is made to the allowance of interest to plaintiff from the date of the referee's report, November 22, 1898, since that was not the date of the final adjustment of the balance found due plaintiff, the final balance not having been arrived at till June 27, 1900. The objection is intensified in significance by the fact that upon this appeal radical changes have been decided upon in the accounts which must

bring the date of the determination of the final balance down
to that of the decision of the case here. It is undoubtedly the
true rule that, except in special circumstances, interest is not
to be allowed upon partnership accounts as between partners
until the final balance is stated, in the absence of an agree-
ment between the parties to the contrary. *Marsh v. Fraser,*
37 Wis. 149; *Gilman v. Vaughan,* 44 Wis. 646. We think,
under all the circumstances, that rule should govern in this
case; that there are no special circumstances varying the gen-
eral rule.

Further objection is made because full costs were taxed in
favor of plaintiff. The matter of costs in such a case rests
in the sound discretion of the trial court under some general
established rules as to what is equitable in such matters, and
subject to review for abuse of judicial authority. *Gilman v.
Vaughan, supra.* Sec. 2918, Stats. 1898. If the judgment
complained of were to be affirmed on the merits, the decision
below as to costs would not be disturbed. However, the as-
pect of the case now is so changed from that apparent to the
trial court that it is by no means certain or even probable that
such court would give full costs to the plaintiff if the matter
were to be decided there. As the case stands it is a very
proper one for a division of costs between the parties. No
reprehensible fault is discovered in the conduct of Mr. Hart.
Everything that came into the partnership business while
under his charge was honestly accounted for. His manner of
keeping the partnership accounts, which has been the subject
of so much complaint, stands justified in a very great degree
by the final outcome. It stands substantially approved, ex-
cept as to the repair and machinery accounts. His conduct
as to those matters may well be attributed to mere mistake
of law,—one made in solving a question of such serious doubt
and difficulty that it has taken several hearings, long litiga-
tion, and at last, upon careful presentation of the matter on

both sides, a decision of this court, to finally determine. Mr. Hart was brought into court charged, among other things, with fraud, which has been wholly disproven. Many untenable claims were made against him in the complaint, which he was compelled to make answer to and to disprove. Instead of the condition of the partnership affairs having been kept from the knowledge of plaintiff as was charged, it appears that she had ample opportunity to inform herself fully; that if she did not it was not the fault of Mr. Hart. No advantage was taken of her by him by reason of his confidential relations to her in any respect. More than twenty years before this suit was commenced and before the machinery and repair accounts were charged to her, but after the debit balances were determined upon, the books were examined and a statement of such accounts made and exhibited to her. That showed due from the estate to the firm $7,177.10, which was rightfully chargeable to the plaintiff, either directly or indirectly, as she ought to have known, and it has been now so charged. The doubt and difficulty that have caused the expense of this litigation are as much attributable to illegitimate claims of plaintiff as to such claims upon the part of Mr. Hart. On the whole at least one half of the costs of the litigation should be paid by plaintiff. What the total thereof was cannot be told here from the record, because, whereas disbursements made by plaintiff were taxed, those made by Mr. Hart were not. We have concluded to adjust the matter without further taxation of costs by naming a sum which will in our judgment require plaintiff to pay at least one half of the entire taxable costs of the suit.

Now we restate the account between the parties in harmony with the foregoing, by starting with the credit balance in the profit and loss account, the debit balances in the accounts to partners, and the two credit items of $50 and $160.15 to plaintiff. That gives us a trial balance sheet with the ac-

counts as they stood before they were closed by striking the
final balance between the partners, thus:

| | | | | |
|---|---|---|---|---|
| Profit and loss...................... | | | $51,535 | 17 |
| J. S. Hart............................ | $29,477 | 61 | | |
| C. C. Hart ........................... | 22,267 | 71 | | |
| C. C. Hart........................ | | | 50 | |
| C. C. Hart........................ | | | 160 | 15 |
| | $51,745 | 32 | $51,745 | 32 |

We are unable to understand why the credits of $50 and
$160.15 were given plaintiff. We cannot even conjecture
why the credit of $160.15 was so given. But as no complaint
in respect thereto is made in the printed brief of defendant,
though the matter seems to have been covered by the excep-
tions, we will leave the subject where we find it.

With the foregoing trial balance to start with, we correct
the improper charge of the debit balance in the estate account,
of $3,320.97, to profit and loss account by crediting the latter
account and charging the former. We correct the error of
crediting plaintiff the rent account of $10,000 and charging
the same to the estate account, by crediting the latter account
and charging the former. We correct the error of giving
plaintiff a credit of $450, the supposed amount of the special
inventory in the estate of J. S. Hart, deceased, by charging
the same back to her, giving credit to profit and loss. That is
a troublesome item to dispose of. We are satisfied that it was
improperly credited to plaintiff. It must have been, when
credited to her, charged to some other account, or otherwise
the accounts as a whole would be out of balance. We have
concluded that it is most probable that it should go to profit
and loss. We find no evidence that it was charged to the es-
tate. It evidently did not represent property actually turned
over to plaintiff which was in the hands of the firm and with
which she was charged, because it seems plain that the special

allowance of property was delivered to plaintiff early in the settlement of the estate and did not come out of property with which the estate was credited on the books of the firm. The corrections of the debit and credit charges as indicated take this form:

| | | | | |
|---|---|---|---|---|
| J. W. Hart estate.......................... | $ 3,320 | 97 | $ 3,320 | 97 |
| Profit and loss........................ | | | | |
| C. C. Hart, rent recharged ............... | 10,000 | | | |
| J. W. Hart estate recredited......... | | | 10,000 | |
| C. C. Hart, special inventory recharged... | 450 | | | |
| Profit and loss....................... | | | 450 | |
| | $13,770 | 97 | $13,770 | 97 |

Using a form more condensed than one technically correct, for greater convenience, we now post such work and balance the accounts ready for final closing between the partners, as follows:

Profit and Loss Account.

| | | | | |
|---|---|---|---|---|
| Circuit court's balance ............... | | | $51,535 | 17 |
| From estate accounts................. | | | 3,320 | 97 |
| From plaintiff's account.............. | | | 450 | |
| True credit balance .............. | $55,306 | 14 | | |
| Proof ...................... ...... | $55,306 | 14 | $55,306 | 14 |
| J. W. Hart's estate Dr. balance........... | $ 3,320 | 97 | $10,000 | |
| Rent from plaintiff's account......... | | | | |
| True Cr. balance................. | 6,679 | 03 | | |
| Proof ...................... ......... | $10,000 | | $10,000 | |
| J. S. Hart, circuit court balance.......... | $29,477 | 61 | | |
| C. C. Hart, circuit court balance.......... | $22,267 | 71 | | |
| Credit items........................ | | | 50 | |
| | | | 160 | 15 |
| Recharge................................ | 450 | | | |
| Recharge ............................... | 10,000 | | | |
| True Dr. balance.................... | | | 32,507 | 56 |
| Proof ...................... ........ | $32,717 | 71 | $32,717 | 71 |

Hart v. Hart, 117 Wis. 639.

Collection of Above Balances.

| | | | | |
|---|---|---|---|---|
| Profit and loss..... ................ | | | $55,306 | 14 |
| J. W. Hart estate ..................... | | | 6,679 | 03 |
| J. S. Hart............................. | $29,477 | 61 | | |
| C. C. Hart............................. | 32,507 | 56 | | |
| | $61,985 | 17 | $61,985 | 17 |

We now dispose of the estate account by crediting thereon an amount equal thereto, giving plaintiff credit for a corresponding amount, and dispose of the profit and loss account in the ordinary way by crediting one half thereof to each of the partners and charging to profit and loss corresponding amounts in this form:

| | | | | |
|---|---|---|---|---|
| J. W. Hart estate........................ | $ 6,679 | 03 | | |
| C. C. Hart........................... | | | $ 6,679 | 03 |
| ½ profit and loss...................... | 27,653 | 07 | | |
| J. S. Hart ........................... | | | 27,653 | 07 |
| ½ profit and loss........'............. | 27,653 | 07 | | |
| C. C. Hart ........................... | | | 27,653 | 07 |

We now post that work into the proper accounts and bring them to a balance in this form:

| | | | | |
|---|---|---|---|---|
| Profit and loss Cr. balance down...... | | | $55,306 | 14 |
| ½ J. S. Hart...........,............. | $27,653 | 07 | | |
| ½ C. C. Hart......................... | 27,653 | 07 | | |
| | $55,306 | 14 | $55,306 | 14 |
| J. W. Hart estate balance down ....... | | | $ 6,679 | 03 |
| Covered into C. C. Hart account......... | $ 6,679 | 03 | | |
| C. C. Hart balance down................ | $32,507 | 56 | | |
| From estate account.................. | | | $ 6,679 | 03 |
| ½ profit and loss..................... | | | 27,653 | 07 |
| Cr. balance........................... | 1,824 | 54 | | |
| | $34,332 | 10 | $34,332 | 10 |
| J. S. Hart, bal. down .................... | $29,477 | 61 | | |
| ½ profit and loss ........... ......·..... | | | $27,653 | 07 |
| Final Dr. balance..................... | | | 1,824 | 54 |
| | $29,477 | 61 | $29,477 | 61 |

Showing, as a final result, that plaintiff has a credit balance of $1,824.54, and that there is a debit balance against the J. S. Hart interest of a corresponding amount. She is entitled to judgment for $1,824.54, with interest thereon from the date of the filing of this opinion and an equitable portion of the costs of the litigation, which we fix at $75. Defendant should have as costs in this court on plaintiff's appeal, attorney's fees, clerk's fees, and only $50 for printing, and on his appeal attorney's fees, clerk's fees, and $75 for printing.

*By the Court.*—The judgment of this court is that plaintiff take nothing on her appeal and that defendant recover thereon clerk's fees, attorney's fees, and fifty dollars for printing. The judgment on defendant's appeal is that the judgment appealed from be and is hereby modified by changing the words and figures for damages therein "three thousand seven hundred ten and 2-100 dollars ($3,710.02)" to one thousand eight hundred twenty-four and 54-100 dollars ($1,824.54) and by changing the words and figures for costs to seventy-five dollars, and by changing the date from which interest is to be recovered on damages to May 8, 1903; and that, as so modified, the judgment is affirmed, defendant to recover on his appeal, as costs, clerk's fees, attorney's fees, and $75 for printing.

DODGE, J., took no part.