Michael YAUGER and Brenda Yauger, Plaintiffs-Appellants,†

v.

SKIING ENTERPRISES, INC., d/b/a Hidden Valley Ski Area, a Wisconsin corporation, and Investors Insurance Company of America, a foreign corporation, Defendants-Respondents.

Court of Appeals

*No. 94–2683. Oral argument July 12, 1995.—Decided August 23, 1995.*

(Also reported in 538 N.W.2d 834.)

†Petition to review granted.

486

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Gary L. Bendix* and *John M. Bruce* of *Savage, Gregorski, Webster, Stangel & Bendix, S.C.* of Manitowoc. There was oral argument by *John M. Bruce*.

On behalf of the defendants-respondents, there was a brief and oral argument by *Thomas B. Hartley* of *Guttormsen, Hartley & Guttormsen* of Kenosha.

Before Anderson, P.J., Brown and Snyder, JJ.

BROWN, J.   We are asked to gauge whether the exculpatory contract in this case is void as against public policy. Here, Brenda and Michael Yauger brought a wrongful death action against Hidden Valley Ski Area after their eleven-year-old daughter, Tara, was killed when she struck the concrete base of a ski lift tower. The trial court dismissed the claim finding that the

Yaugers' contract with Hidden Valley for a season pass contained a valid exculpatory clause. The Yaugers now reassert their challenge that it is void.

The following facts were taken from the appellate record consisting of the pleadings, affidavits and depositions. On October 8, 1992, Michael Yauger submitted an application for a family season pass at Hidden Valley. This form is reproduced at the end of the opinion. The pass cost roughly $720. Although only Michael signed the application, his wife and two daughters (then ages ten and eight) were named on the form. Depositions reveal that Michael submitted the application in person at the Hidden Valley Ski Shop.

The Yauger family was familiar with Hidden Valley. Michael had skied there approximately sixty times in the three seasons prior to the accident, and Tara had skied there about fifty times prior to her accident. The record also shows that the Yauger family had a season pass at the resort the prior year.

On March 7, 1993, Tara suffered her fatal accident. The exact facts surrounding her death are unsettled, but the record currently suggests that she struck the side of a concrete base of a ski lift tower. The Yaugers sued Hidden Valley that October, claiming that this support was not adequately padded.

After limited discovery, Hidden Valley and its insurer sought summary judgment on grounds that the exculpatory release within the Yaugers' contract for a season pass barred them from bringing this claim since it arose out of the "certain inherent risks in skiing." The Yaugers responded that the clause was invalid as against public policy because it was not knowingly entered into by each of the Yaugers, was ambiguous and overbroad and also attempted to encompass protections provided under Wisconsin's safe-place law.

The trial court granted Hidden Valley's motion. It focused its analysis on the phrase "certain inherent risks in skiing" and reasoned that it covered the type of injury that killed Tara, namely, the risk that a skier will collide with a stationary object. It also rejected the Yaugers' argument that Brenda Yauger was not bound by the exculpatory clause, finding that her express endorsement was not necessary since she received the benefit of the season pass.

We are reviewing a grant of summary judgment; thus, § 802.08(2), STATS., governs the analysis. *See Decade's Monthly Income and Appreciation Fund v. Whyte & Hirschboeck, S.C.,* 164 Wis. 2d 227, 230, 474 N.W.2d 766, 767 (Ct. App. 1991), *aff'd,* 173 Wis. 2d 665, 495 N.W.2d 335 (1993). Summary judgment is appropriate when there are no material issues of fact and the moving party is entitled to judgment as a matter of law. *Id.* Moreover, this appeal concerns the interpretation of a contract which appellate courts address de novo. *Id.* at 230-31, 474 N.W.2d at 767. Therefore, to defeat Hidden Valley's motion for summary judgment the Yaugers must show that material facts are in dispute, or that the trial court erred in its analysis of the exculpatory clause. *See id.* at 230-31, 474 N.W.2d at 767.

We first turn to the analysis of the season pass and its exculpatory clause. Wisconsin law does not favor these agreements and courts therefore examine with care the facts of each case to ascertain whether enforcement will contravene public policy. *See Merten v. Nathan,* 108 Wis. 2d 205, 210-11, 321 N.W.2d 173, 176 (1982). The goal is to strike a balance between conflicting principles of contract and tort law. *See id.* at 211, 321 N.W.2d at 177. Freedom of contract suggests that

492

courts should abstain from interfering in people's relationships and personal affairs. *See id.* On the other hand, tort law recognizes that those responsible for causing harm through negligence should bear the cost of the harm and should not be allowed to circumvent this duty through contract. *See id.* at 211-12, 321 N.W.2d at 177.

A review of the recent supreme court cases on this issue indicates that there are two aspects to the question of whether an exculpatory contract violates public policy. In *Dobratz v. Thomson,* 161 Wis. 2d 502, 468 N.W.2d 654 (1991), the court cited with approval § 195 of the RESTATEMENT (SECOND) OF CONTRACTS (1979), which sets out a series of situations in which an exculpatory contract would violate public policy. *Id.* at 515-16, 468 N.W.2d at 658-59 (citing *Arnold v. Shawano County Agric. Soc'y,* 111 Wis. 2d 203, 210-11, 330 N.W.2d 773, 777 (1983)). The first element tests the effect of the exculpatory clause, e.g., does it exempt an employer from suits by an employee. *See id.*[1]

The Yaugers' assertion that the exculpatory clause in Hidden Valley's season pass application contravenes the safe-place statute, § 101.11, STATS., fits this line of analysis. In further support of this argument they cite *Meyer v. Val-Lo-Will Farms, Inc.,* 14 Wis. 2d 616, 111

---

[1] This two-prong analysis was also discussed in *Discount Fabric House v. Wisconsin Telephone Co.,* 117 Wis. 2d 587, 602, 345 N.W.2d 417, 424-25 (1984), where the court faced a challenge to an exculpatory release that served to cover any errors in telephone directory advertising. The court explained that the analysis of such contracts involves an assessment of the "commercial reasonableness" of the terms (substantive) and the relationship between the parties during negotiations (procedural). *Id.*

N.W.2d 500 (1961), for the proposition that a for-profit winter sports park was subject to the safe-place law. In substance, they argue that the exculpatory clause violates public policy because it seeks to relieve Hidden Valley of the duty imposed by the statute. *See* RESTATEMENT (SECOND) OF CONTRACTS § 195(2)(c).[2] The trial court rejected this argument, reasoning that the safe-place statute did not create a special cause of action, but established a higher duty of care for what would ordinarily be addressed through common law negligence.

While we agree with the trial court's result, a different analysis is appropriate. Moreover, we need not decide the issue of whether the safe-place law imposed a special statutory duty on Hidden Valley. We hold that even if the statute does apply, a potential defendant may still bargain for an exclusion.

As noted above, the supreme court has endorsed § 195 of the RESTATEMENT (SECOND) OF CONTRACTS. *See Merten,* 108 Wis. 2d at 212-13, 321 N.W.2d at 177-78.[3]

---

[2] The applicability of the safe-place statute, § 101.11, STATS., in situations where frequenters challenge exculpatory contracts was raised, but left unanswered, in *Kellar v. Lloyd,* 180 Wis. 2d 162, 178-81, 509 N.W.2d 87, 93-94 (Ct. App. 1993).

[3] We recognize that the exact status of RESTATEMENT (SECOND) OF CONTRACTS § 195 (1979), is somewhat clouded. In *Dobratz v. Thomson,* 161 Wis. 2d 502, 515-16, 468 N.W.2d 654, 658-59 (1991), the court expressly quoted all the subsections after noting that it had originally "referred with approval" to them in *Arnold v. Shawano County Agric. Soc'y,* 111 Wis. 2d 203, 210-11, 330 N.W.2d 773, 777 (1983). When one examines the *Arnold* opinion, however, it includes only a general reference to the RESTATEMENT. Indeed, the rule in § 195(2)(c), which provides the basis for the Yaugers' argument, was not referred to in the discussion. *See Arnold,* 111 Wis. 2d at 210-11, 330

The official comment to this section, however, suggests that the enumerated standards are not a litmus test for these agreements; it states: "[t]he rigor of this rule may, however, be mitigated by a fairly bargained for agreement to limit liability to a reasonable agreed value in return for a lower rate." RESTATEMENT (SECOND) OF CONTRACTS § 195 cmt. a.

The process envisioned by the drafters of this comment aptly describes the transaction between the Yaugers and Hidden Valley. The Yaugers wanted a discount on their skiing. The resort was a willing supplier, but recognized that the increase in days skied would directly increase the risk of an accident and the potential for a damages claim. Hidden Valley therefore sought a release from liability. Gauging the deal at the time when the parties entered into the contract, we cannot say that the exchange was totally unreasonable. The Yaugers obtained their discount, but lost the right to bring a claim arising out of an accident which may never have occurred. Here, freedom of contract requires that we not delve deeper into the merits of this

N.W.2d at 777. Moreover, in the supreme court's most recent exploration of these issues, the majority opinion made no reference to § 195, although it did reaffirm its confidence in the *Dobratz* decision. *Richards v. Richards,* 181 Wis. 2d 1007, 1014, 513 N.W.2d 118, 121 (1994). We have located a federal district court case in which the various subsections of § 195 were found to be a component of Wisconsin law and formed the basis for voiding an exculpatory contract. *See RepublicBank Dallas, N.A. v. First Wisconsin Nat'l Bank,* 636 F. Supp. 1470, 1473 (E.D. Wis. 1986) (voiding clause exempting liability for harm arising out of reckless or intentional acts). We thus find that § 195 continues to be a valid component of Wisconsin common law.

agreement. *See Merten,* 108 Wis. 2d at 211, 321 N.W.2d at 177.[4]

The second prong of the public policy question entails examining the circumstances surrounding the bargaining process. *See Dobratz,* 161 Wis. 2d at 516 n.2, 468 N.W.2d at 659. For example, in *Richards v. Richards,* 181 Wis. 2d 1007, 1010, 513 N.W.2d 118, 119 (1994),[5] the supreme court was asked to review an exculpatory contract signed by a passenger in a commercial, long-haul truck. The plaintiff was married to a driver employed by the defendant and was asked to sign a "passenger authorization" before joining her husband on the road. *Id.* at 1012, 513 N.W.2d at 119. Within the form was a clause releasing the defendant from liability for any harm that might occur during her travels. *Id.* Still, the wife brought suit after she and her husband were involved in an accident. The lower courts found that the release was valid and granted summary

---

[4] Of course the above analysis certainly does not summarize all the concerns of the bargaining parties. The Yaugers and Hidden Valley were also making allowances for the risk that there would be no snow that season. The key to understanding our analysis, however, is to recognize that courts rarely are able to do a better job of writing contracts than the parties themselves.

[5] We discuss *Richards* in detail because it represents the supreme court's most recent analysis of how flaws in the specific terms of an agreement, or the circumstances of the bargaining process, may serve as grounds for voiding an exculpatory agreement. For other examples, see *Merten v. Nathan,* 108 Wis. 2d 205, 214-15, 321 N.W.2d 173, 178 (1982) (release invalidated because defendant misrepresented a fact during the negotiation process), and *Eder v. Lake Geneva Raceway,* 187 Wis. 2d 596, 610-11, 523 N.W.2d 429, 434 (Ct. App. 1994) (release clause found to be ambiguous).

judgment for the defendant. *Id.* at 1010, 513 N.W.2d at 119.

After its review of the contract, however, the supreme court found it to be void as contrary to public policy. *Id.* at 1011, 513 N.W.2d at 119. The majority pointed to three aspects of the agreement, which together led to this conclusion. First, the contract served two purposes. The court emphasized that the exculpatory clause was not distinguishable from other components of the document. It reasoned that high-lighting the release provision would have provided greater protection for the signing party. *See id.* at 1017, 513 N.W.2d at 122.

Next, the court found that the contract was over-inclusive. It applied not only to the defendant, but also to all of its affiliates. Moreover, it did not delineate the nature of claims that would be excluded, such as those arising from negligence but not from intentional acts. Also, the time period through which the exclusion would apply was not limited. The majority found that the contract was lopsided in favor of the defendant and should therefore be construed against the company. *See id.* at 1017-18, 513 N.W.2d at 122.

Finally, the court noted that the release was embodied in a standard form contract, and the defendant did not inform the plaintiff of the purpose and effect of the authorization. This suggested that there was little or no opportunity to dicker about the terms. *Id.* at 1019, 513 N.W.2d at 123.

The Yaugers cite *Richards* and raise a number of arguments, each suggesting that they and Hidden Valley were not on equal footing when they entered into this agreement. The many issues they raise can be distilled into three central points. First, the Yaugers contend that the release clause, which was a single

term in the season pass application, was never pointed out to Michael before he completed and signed the form. *See Richards,* 181 Wis. 2d at 1019, 513 N.W.2d at 123. They further assert that summary judgment was inappropriate because Hidden Valley presented no evidence on this issue.

■

We are not persuaded. This agreement was signed in October, at least one month prior to the skiing season. There was no sense of urgency. Michael could have taken the form home for further consideration. In addition, the Yaugers had purchased a season pass for the prior year. Therefore, Michael had a source of knowledge from which to draw comparisons. *Compare Eder v. Lake Geneva Raceway,* 187 Wis. 2d 596, 609, 523 N.W.2d 429, 433 (Ct. App. 1994)(noting that parties signing the release were not allowed onto the racetrack grounds until they signed the release form).

Next, the Yaugers assert that the language within the exculpatory clause is ambiguous. It specifically addressed "certain inherent risks in skiing." They question what constitutes these "inherent risks" and whether the clause only applies to a "certain" number of these dangers. In addition, they note that Hidden Valley did not provide any evidence which would identify these risks. The Yaugers also raise concerns that the clause (which is composed of a single sentence) reads to limit Hidden Valley's liability for any injury occurring on the premises. They stress that this could be reasonably interpreted as an attempt to limit the resort's liability for any accident on the premises, such as a slip and fall in the restaurant. *See Richards,* 181 Wis. 2d at 1017-18, 513 N.W.2d at 122.

The trial court concluded that the terminology covered the obvious dangers in skiing, viz, falling down or

colliding with another skier or a fixed object, and that the "any injury" language was limited to those harms arising out of these risks. We agree.

Whether a contract is ambiguous is a question of law. *Borchardt v. Wilk,* 156 Wis. 2d 420, 427, 456 N.W.2d 653, 656 (Ct. App. 1990). We test whether the term is reasonable or fairly susceptible of more than one construction. *Id.* A clause is not ambiguous, however, merely because its language is general or broad. *See Wilke v. First Federal Savs. & Loan Ass'n,* 108 Wis. 2d 650, 654, 323 N.W.2d 179, 181 (Ct. App. 1982).

This was a contract between Hidden Valley and a season pass holder. The contracting skier, therefore, could reasonably be expected to have some knowledge about the sport. The Yaugers' interest in skiing is further demonstrated by their willingness to commit over seven hundred dollars to skiing that season.[6] The record also reveals that the Yaugers had a similar pass at the resort the prior year. We are thus hesitant to accept their arguments that such language would lead to confusion among parties executing these agreements. The language is plain and simple. It aptly describes the risks that arise whenever one's skis are in contact with the slope.[7]

---

[6] The season pass was not refundable.

[7] Very similar language can be found in Wisconsin's recreational responsibility law. *See* § 895.525(3), STATS. ("A participant in a recreational activity . . . *accepts the risks inherent* in the recreational activity . . . .") (emphasis added). Moreover, several states have adopted specific skier responsibility laws which codify these terms. For example, Colorado law provides, in part:

Finally, the Yaugers argue that the exculpatory clause should be held void because it was "not clearly identified or distinguished." *See Richards,* 181 Wis. 2d at 1017, 513 N.W.2d at 122.

The trial court noted that although the exculpatory language was not highlighted, there was no indication that it was disguised and therefore did not provide grounds for rendering the agreement void. Indeed, the clause is set out in a separate paragraph.

Any break in text requires the reader to pause and thus provides a moment for reflection.

The face of the application does not otherwise suggest that Hidden Valley was trying to trick season pass holders into signing away their rights. It was an application form. Not only did the applicants have to sign the agreement, but they had to furnish information

"Inherent dangers and risks of skiing" means those dangers or conditions which are an integral part of the sport of skiing, including changing weather conditions; snow conditions as they exist or may change, such as ice, hard pack, powder, packed powder, wind pack, corn, crust, slush, cut-up snow, and machine-made snow; surface or subsurface conditions such as bare spots, forest growth, rocks, stumps, streambeds, and trees, or other natural objects, and collisions with such natural objects; *impact with lift towers,* signs, posts, fences or enclosures, hydrants, water pipes, other man-made structures and their components; variations in steepness or terrain, whether natural or as a result of slope design, snowmaking or grooming operations, including but not limited to roads and catwalks or other terrain modifications; collisions with other skiers; and the failure of skiers to ski within their own abilities.

COLO. REV. STAT. ANN. 33-44-103(10) (West Supp. 1994) (emphasis added).

Further discussion of these laws, and judicial efforts in providing interpretation, are set forth in Arthur N. Frakt and Janna S. Rankin, *Surveying the Slippery Slope: The Questionable Value of Legislation to Limit Ski Area Liability*, 28 IDAHO L. REV. 227 (1991-92).

such as their address, age, other family member names, etc. In sum, the form and application process provided ample opportunity for Michael to consider the terms of the agreement.

We have addressed a variety of concerns about the exculpatory clause of the season pass contract. Although no single point is troublesome enough to render the clause void, *Richards* suggests that courts may consider all these aspects together when making a determination about the effects of public policy. *See id.* at 1011, 513 N.W.2d at 119. But even the totality of the circumstances presented here does not warrant that this contract be set aside. The contracting process simply does not raise any concern of overreaching by the party seeking to be released from liability.[8]

We now turn to the second issue presented. Although we have found that the exculpatory clause serves as a bar to the Yaugers' claim, Brenda nonetheless asserts that it should not run against her individually since she did not expressly acknowledge these terms, nor did she authorize her husband to execute a contract releasing these claims. In support of her argument, she draws an analogy to *Arnold v. Shawano County Agri. Soc'y,* 111 Wis. 2d 203, 214-15, 330 N.W.2d 773, 779 (1983), where the court held that a

---

[8] The Yaugers raised one other challenge to the exculpatory clause relating to the contract language. They assert that under *Hortman v. Otis Erecting Co.,* 108 Wis. 2d 456, 463, 322 N.W.2d 482, 485-86 (Ct. App. 1982), an agreement which indemnifies a party for its own negligence must specifically include the term "negligence." As the defendants contend, however, this specific argument was not presented to the trial court and is therefore waived on appeal. *See, e.g., Bank One, Appleton, N.A. v. Reynolds,* 176 Wis. 2d 218, 222, 500 N.W.2d 337, 339 (Ct. App. 1993).

spouse's claim for consortium rights is not defeated by a valid exculpatory contract running against the deceased.

In dismissing this claim the trial court distinguished *Arnold*, stating:

> In this case the plaintiff Brenda Yauger did not sign the application, but the application was made on her behalf and for her benefit, which is not the factual situation in Arnold. And she is specifically identified and money is specifically paid for her membership, for her use, and the use of her daughter . . ..

Although we agree in substance with the trial court's analysis, we feel it necessary to elaborate further. We add that Brenda's claim is barred by the exculpatory clause because it is so intertwined with that of her husband, and thus it was reasonable for Hidden Valley to assume that Michael was acting on her behalf when he executed the agreement.

The Yaugers' claim has three components: loss of consortium, Tara's medical expenses and the cost of her funeral. *See* § 895.04(4), STATS. The right to pursue a claim for these losses accrues to Michael and Brenda as the "parents of the deceased." *See id.* This is not a situation in which one parent's *recovery* is limited or barred by his or her negligence. *See* § 895.04(7). This distinction recently was addressed in *Chang v. State Farm Mut. Auto. Ins. Co.*, 182 Wis. 2d 549, 561, 514 N.W.2d 399, 403 (1994), where the court noted: "[t]he right to sue and recover damages under the wrongful death statute must be distinguished from the ownership and allocation of the recovery itself."

Brenda alleges that she never authorized her husband to enter into this exculpatory clause (and bargain

away her right to pursue a potential claim), nor was she aware of its effects. Nevertheless, she shared equally in the benefits that arose to her family, and the face of the application form would suggest that all named parties are bound by its terms.

Although there is little case law applying the principles of agency in transactions between married persons and third parties, *Smart v. Estate of Ford*, 23 Wis. 2d 60, 65-66, 126 N.W.2d 573, 576 (1964), summarized the Wisconsin rule that third parties may reasonably believe that one spouse had authority to act on behalf of the other. Here, we are dealing with the Yaugers' joint interest in the companionship of their beloved daughter. Michael completed the season pass application on behalf of his whole family and paid the appropriate sum. Absent any evidence that Brenda informed Hidden Valley that she was not bound by this agreement, the Yaugers should both be held by the terms of the application.

*By the Court.*—Judgment affirmed.

# HIDDEN VALLEY SKI AREA

MANITOWOC, WISCONSIN

SKI AREA/SNOW REPORTS PHONE: 414-863-2713
MANITOWOC/OFFICE PHONE: 414-684-5475

## APPLICATION

I hereby apply for a 1992-1993 season membership pass/passes privilege at Hidden Valley Ski Area for the following named persons.
*INCLUDE RECENT FULL FACE 2" x 2" PHOTO FOR EACH PASS TO BE ISSUED WITH THE NAME OF PERSON ON THE BACK. (Do not submit poloroids which have been or need cutting.)

1. NAME: _MICHAEL YAUGER_ Age: _30_ Phone: _755-2355_
   ADDRESS: _307 CHURCH ST MISHICOT WI 54228_ Grade: _____
   (Full street number or Box number, city, state and full zip code.) *Print clearly

2. NAME: _BLONDA YAUGER_ Age: _30_ Relationship: _WIFE_ Grade: _____

3. NAME: _TARA YAUGER_ Age: _10_ Relationship: _DAUGHTER_ Grade: _5_

4. NAME: _FELICIA YAUGER_ Age: _8_ Relationship: _DAUGHTER_ Grade: _3_

5. NAME: _____ Age: ____ Relationship: _____ Grade: ____

6. NAME: _____ Age: ____ Relationship: _____ Grade: ____

7. NAME: _____ Age: ____ Relationship: _____ Grade: ____

8. NAME: _____ Age: ____ Relationship: _____ Grade: ____

In support of this application for membership, I agree that:

1. There are certain inherent risks in skiing and thus we agree to hold Hidden Valley Ski Area/Skiing Enterprises Inc. harmless on account of any injury incurred by me or my family member on the Hidden Valley Ski Area premises.

2. Hidden Valley Ski Area reserves the right to make reasonable rules for the safety and convenience of its patrons and for proper utilization of its facilities. We agree to obey these rules which include the Skiers Responsibility Code and the ski Area safety rules and rules under the State of Wisconsin codes which Hidden Valley must enforce. Violations of these rules is a misdemeanor. Rules are posted in the lodge and on the slopes. All signs per State regulations are posted on lifts and ski slopes.

3. Re-selling, exchanging or lending of either lift ticket or season pass will result in loss of skiing privileges under this membership. Passes cannot be refunded.

4. If I do not have my pass with me when I arrive at Hidden Valley, I will have to pay for the purchase of a ticket at the ticket window. Replacement of a lost pass $20. will be charged upon request of replacement by phone or mail to Hidden Valley office.

5. Any misconduct or violation of ski area rules and regulations will result in loss of of membership pass without refund. Ski Area management will make decisions as to violations or misconduct. Ski Patrols will enforce ski slopes violations.

_____ Date: _10/8/92_

* Signature of Member/Adult Responsible. (If under 18 Parent or guardian must sign.)

Enclosed is my check # _5143_ Amount $ _719.25_ for the above requested Season Passes.

_150 #NOTES_

_685.00 + 34.25 TX_