James M. Kernz, Plaintiff-Respondent-Cross-Appellant,

v.

J. L. French Corporation, Defendant-Appellant-Cross-Respondent.†

Court of Appeals

*No. 02–1291. Submitted on briefs December 9, 2002.—Decided June 12, 2003.*

2003 WI App 140

(Also reported in 667 N.W.2d 751.)

† Petition to review denied 10-27-03.

On behalf of the defendant-appellant-cross-respondent, the cause was submitted on the briefs of *Joseph J. Voelkner* and *James O. Conway* of *Olsen, Kloet, Gunderson & Conway*, Sheboygan.

On behalf of the plaintiff-respondent-cross-appellant, the cause was submitted on the briefs of *Anthony J. Resimius* and *William P. Te Winkle* of *Rohde Dales LLP*, Sheboygan.

Before Vergeront, P.J., Roggensack and Lundsten, JJ.

¶ 1. LUNDSTEN, J. This appeal involves an employment contract dispute. Employee James Kernz negotiated a three-year contract with J. L. French Corporation that required the company to pay Kernz's salary and benefits for the remainder of the contract term if the company terminated Kernz without "just cause." Nine months into the contract, French Corporation terminated Kernz and Kernz sued for breach of contract, alleging he was terminated without "just cause." Kernz sought more than $260,000 under the contract damages clause. French Corporation countered that Kernz was terminated for "just cause" and argued in the alternative that, even if it terminated Kernz without just cause, the damages clause was an unenforceable "penalty clause." Following a jury trial in which French Corporation was found liable for termination without just cause, the trial court concluded that the damages clause was enforceable and entered judgment in favor of Kernz. French Corporation appeals from that judgment. Post-trial, the trial court entered an order denying Kernz's motion for pre-verdict interest, which forms the basis of Kernz's cross-appeal.

### Background

¶ 2. On April 27, 2000, Kernz and French Corporation entered into a three-year employment contract. French Corporation offered language which permitted

the company to terminate Kernz if he "shall be neglectful of the interest of the employer, or manage the business under his supervision badly or in a manner unsatisfactory to employer, or shall be guilty of misconduct." During negotiations, Kernz requested, and the French Corporation negotiator agreed, to replace the above provision with "just cause" language. The following shows the agreed change with the stricken language and the added language in italics:

> If the Employee *is terminated for "just cause," or by mutual agreement,* ~~shall be neglectful of the interest of the employer, or manage the business under his supervision badly or in a manner unsatisfactory to employer, or shall be guilty of misconduct,~~ the Employer may at their option terminate this agreement and such services and compensation on thirty (30) days notice to the Employee.

¶ 3. In early 2001, Kernz was accused of committing "two safety violations of . . . plant employee safety rules." In one incident, Kernz was observed entering a secured area containing a 3,500–ton press without following the proper "lock-out" procedures. In the other incident, Kernz was observed on foot in an area where pedestrian traffic was prohibited. French Corporation terminated Kernz's employment.

¶ 4. Kernz sued, alleging that French Corporation breached the contract by terminating him without "just cause." Kernz sought a pretrial ruling declaring the phrase "just cause" ambiguous and permitting the introduction of extrinsic evidence of the phrase's meaning. The trial court concluded that the phrase "just cause" was ambiguous and ruled that extrinsic evidence would be permitted. French Corporation moved to prevent testimony of any witness's subjective uncom-

municated belief regarding the meaning of "just cause."
The trial court denied that motion.

¶ 5. The trial was held in two phases: the first
phase was tried before a jury to determine liability, and
the second phase was tried to the court to determine
damages. During the liability phase, Kernz testified
that, during contract negotiations, he sought inclusion
of the phrase "just cause" because "I needed something
where . . . [French Corporation] didn't have the option
to terminate in the contract unless it was for some
intentional wrongdoing." The deposition testimony of
Don Porritt, the negotiator for French Corporation, was
read to the jury. The French Corporation negotiator
testified that "just cause to me would be if you inten-
tionally do something." The negotiator also provided
examples of intentional misbehavior that he believed
constituted "just cause" for termination at French Cor-
poration, including "fighting on company property, re-
porting under the influence of drugs or . . . theft, . . .
those sorts of things that had already been outlined in
the [employee] handbook." The French Corporation
negotiator gave no further testimony about the em-
ployee handbook and there was no evidence that
French Corporation employees generally understood
that "just cause" has a particular meaning. Notably,
neither Kernz nor the French Corporation negotiator
testified that he communicated his belief about the
meaning of "just cause" to the other. There was no
special verdict asking the jury to make a finding on the
meaning of "just cause." The jury was simply asked if
French Corporation terminated Kernz for "just cause"
as set forth in the contract, and the jury answered that
question "No."

¶ 6. During the damages phase, the trial court
considered whether the contract damages clause ("If

132

employment is terminated for other than 'just cause' or mutual agreement, the Employer shall pay salary and benefits for [the] remainder of the contract.") was an illegal penalty clause or an enforceable stipulated damages provision. The trial court concluded that the damages clause was an enforceable stipulated damages provision and determined that Kernz was due $263,993.02 under the contract.

¶ 7. Kernz sought pre-verdict interest on the damages under the theory that the damages were liquidated. French Corporation objected to the taxation of prejudgment interest. The trial court agreed with French Corporation and denied Kernz's post-trial motion for pre-verdict interest.

## *Appeal*

### *I. Whether Evidence of the Parties' Uncommunicated Subjective Interpretations of "Just Cause" Was Properly Admitted*

¶ 8. French Corporation argues that "just cause" is unambiguous and, therefore, the trial court improperly admitted extrinsic evidence, including uncommunicated subjective interpretations of "just cause." Whether a contract is ambiguous is a question of law, which we review *de novo. State v. Windom,* 169 Wis. 2d 341, 349, 485 N.W.2d 832 (Ct. App. 1992).

¶ 9. "The ultimate aim of all contract interpretation is to ascertain the intent of the parties." *Eden Stone Co. v. Oakfield Stone Co.,* 166 Wis. 2d 105, 116, 479 N.W.2d 557 (Ct. App. 1991). While this ultimate aim is clear enough, confusion frequently accompanies the

search for intent because subjective intent is not the be-all and end-all. For example, regardless of the parties' intentions, unambiguous contract language controls contract interpretation. "When the terms of a contract are plain and unambiguous, we will construe the contract as it stands." *State v. Peppertree Resort Villas, Inc.*, 2002 WI App 207, ¶ 14, 257 Wis. 2d 421, 651 N.W.2d 345. We presume the parties' intent is evidenced by the words they choose, if those words are unambiguous.

¶ 10. We first determine whether a disputed contract provision is ambiguous. "Contract language is considered ambiguous if it is susceptible to more than one reasonable interpretation." *Danbeck v. American Family Mut. Ins. Co.*, 2001 WI 91, ¶ 10, 245 Wis. 2d 186, 629 N.W.2d 150. If the contract is ambiguous, we turn to extrinsic evidence to determine the parties' intent. *See Energy Complexes, Inc. v. Eau Claire County*, 152 Wis. 2d 453, 468, 449 N.W.2d 35 (1989) ("Once a contract is found to be ambiguous, extrinsic evidence can be considered in order to determine the parties' intent."). Admissible extrinsic evidence might include "the surrounding circumstances including factors occurring before and after the signing of an agreement." *Board of Regents of Univ. of Wis. Sys. v. Mussallem*, 94 Wis. 2d 657, 671, 289 N.W.2d 801 (1980); *see also Smith v. Osborn*, 66 Wis. 2d 264, 272, 223 N.W.2d 913 (1974) ("In determining the [meaning of ambiguous contract language], this court has held that it is proper to consider the conduct of the parties and the negotiations which took place, both before and after the execution of the documents, and to consider all related documents of the parties."); *Painter v. Estate of Grossman*, 250 Wis. 457, 461, 27 N.W.2d 365 (1947) (" 'The

intention of the parties to any particular transaction may be gathered from their acts and deeds, in connection with surrounding circumstances, as well as from their words . . . .' " (quoting *Tyler v. Burrington*, 39 Wis. 376, 379 (1876))).

¶ 11. The question here is whether the contract phrase "just cause" is ambiguous and, if so, whether the parties' uncommunicated subjective beliefs regarding that phrase are admissible extrinsic evidence where the negotiating parties had substantially the same bargaining power, actually negotiated the contract term, and had substantially the same understanding of the phrase.

### A. Whether the Phrase "Just Cause" is Ambiguous

¶ 12. The employment contract does not define "just cause." French Corporation argues that the phrase is unambiguous because "just cause" has a plain and ordinary meaning defined in case law. That definition, the company contends, is contained in *Millar v. Joint School District*, 2 Wis. 2d 303, 86 N.W.2d 455 (1957), and is "inexcusable neglect." We first observe that *Millar* discusses "good and sufficient cause," not "just cause." *Id.* at 312–14. More importantly, *Millar* does not involve the interpretation of a contract term, but rather addresses the implied authority of a school board to dismiss a teacher for "good and sufficient cause," as defined by common law. *Id.* at 312. French Corporation does not explain why this common law definition applicable to public school teachers constitutes the "plain and ordinary" meaning of "just cause." Indeed, neither *Millar*, nor the cases cited therein, suggest that "good and sufficient cause" has a generally known plain and ordinary meaning. And, there is no evidence that either Kernz or the French Corporation negotiator was aware

of *Millar*. The company merely contends that "good and sufficient cause" and "just cause" have the same meaning, presumably because the phrases may be used in similar contexts. We are not persuaded.

¶ 13. Apart from its reliance on the definition of "good and sufficient cause" found in *Millar*, French Corporation has not attempted to define "just cause." Our own research reveals case law defining "just cause" for purposes of terminating a tenured municipal employee. *See Safransky v. Personnel Bd.*, 62 Wis. 2d 464, 474, 215 N.W.2d 379 (1974) ("just cause" means conduct " 'in violation of important standards of good order . . . so substantial, oft repeated, flagrant, or serious that his retention in service will undermine public confidence in the municipal service' "(quoting *State ex rel. Gudlin v. Civil Service Comm'n*, 27 Wis. 2d 77, 87, 133 N.W.2d 799 (1965))). In addition, several statutes provide a different definition of "just cause" applicable to fire department employees and law enforcement officers. This definition of "just cause" is multi-pronged and, in part, asks whether the disciplinary action "reasonably relates to the seriousness of the alleged violation and to the [employee's] record of service with the [supervisor's] department." *See* Wis. Stat. §§ 59.26(8)(b)5m; 59.52(8)(b); 62.13(5)(em); 62.50(17)(b) (2001–02).[1]

¶ 14. These definitions provide no assistance here. First, the definitions are different from each other, thereby giving lie to the notion that "just cause" has a single "plain and ordinary" meaning. Second, the definitions are geared toward public sector employment. While they may provide a meaning for the term "just cause" contained in some public employment con-

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

tracts, nothing before us suggests that either definition is generally understood to define "just cause" for purposes of private employers or employees.

¶ 15. In *Yauger v. Skiing Enterprises, Inc.*, 196 Wis. 2d 485, 538 N.W.2d 834 (Ct. App. 1995), *rev'd on other grounds*, 206 Wis. 2d 76, 557 N.W.2d 60 (1996), this court determined that the phrase "certain inherent risks in skiing" was "plain and simple" because "[i]t aptly describes the risks that arise whenever one's skis are in contact with the slope." *Yauger*, 196 Wis. 2d at 498–99 (footnote omitted). We cannot similarly ascertain a definite meaning for "just cause." That is not to say that the phrase "just cause" in Kernz's employment contract has no base-line plain meaning. For example, under the facts in this case, the phrase certainly means that French Corporation had to have some job-related reason for terminating Kernz. However, the disputed issue is not whether French Corporation had some job-related reason to terminate Kernz. The issue is whether Kernz correctly argues that he could prevail by showing that he did not engage in intentional wrongdoing.

¶ 16. At the same time, we agree with French Corporation that a phrase is not ambiguous simply because it is general or broad. *See id.* at 499. A phrase need not have a single dictionary definition to avoid ambiguity. *See Ruff v. Graziano*, 220 Wis. 2d 513, 524, 583 N.W.2d 185 (Ct. App. 1998). But it must have, without reference to extrinsic evidence, a workable meaning and *no other reasonable* meaning. *See Danbeck*, 245 Wis. 2d 186, ¶ 10 ("Contract language is considered ambiguous if it is susceptible to more than one reasonable interpretation."). We are confronted with two competing definitions of "just cause." French

Corporation contends that "just cause" means "inexcusable neglect." At trial, Kernz presented evidence that "just cause" means "intentional wrongdoing." In our view, each of these definitions is a reasonable interpretation of "just cause" and, therefore, we proceed to examine the challenged extrinsic evidence admitted at trial.

*B. Whether Evidence of the Parties' Uncommunicated Subjective Interpretations of an Ambiguous Contract Provision is Admissible When the Negotiators for Each Party Share a Substantially Similar Subjective Interpretation*

¶ 17. The facts in this case are unusual. Neither the parties nor this court has uncovered a case with similar facts. Kernz alleges that both he and the French Corporation negotiator testified, in substance, that he believed at the time of the negotiations that the phrase "just cause" meant intentional wrongdoing. At trial, and now on appeal, French Corporation disclaims the subjective belief of its own negotiator. Accordingly, we are faced with the question whether a party may present evidence that the negotiators for two parties to a contract had substantially the same belief regarding the meaning of an ambiguous contract phrase when there is no evidence that those beliefs were communicated.

¶ 18. We stress that this issue arises in the context of a phrase that was actually the subject of negotiation and where the parties had substantially equal bargaining power. Kernz successfully requested that the phrase "just cause" be substituted for other language. This is not a situation in which the contract was unilaterally drafted by an employer with substantially

greater bargaining power and we do not comment on whether our analysis would be different under such facts.

¶ 19. French Corporation argues that the uncommunicated subjective beliefs of parties to a negotiation are not admissible to show the meaning of an ambiguous contract phrase. In its motion in limine seeking to exclude testimony of its own negotiator and Kernz, French Corporation quoted from 17A Am. Jur. 2d *Contracts* § 352, at 368 (1991):

> It is not necessarily the real intent, but the expressed or apparent intent, which is sought. Indeed, a party's subjective, undisclosed intent is immaterial to the interpretation of a contract. The court will not attempt to ascertain the actual mental processes of the parties in entering into the particular contract; rather the law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest.

¶ 20. French Corporation's general proposition, that a party's uncommunicated subjective intent is inadmissible, has support in the case law. In *Hart v. Hart*, 117 Wis. 639, 94 N.W. 890 (1903), the court stated: "Probably no rule is better understood than that the opinions of the parties to the contract as to what they took it to mean cannot be resorted to, either to explain or change [the terms of the contract]." *Id.* at 654. This and similar statements seemingly conflict with the age-old maxim that a contract is formed when parties reach a "meeting of the minds." *E.g., Todorovich v. Kinnickinnic Mut. Loan & Bldg. Ass'n*, 238 Wis. 39, 42, 298 N.W. 226 (1941) ("To constitute an acceptance and the creation of a contract there must be a meeting of the minds upon all essential terms thereof."). How-

139

ever, it is well established that an actual "meeting of the minds" is not a prerequisite to an enforceable contract. *See Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 180–81, 557 N.W.2d 67 (1996) ("[P]arties do not need to agree subjectively to the same interpretation at the time of contracting in order for there to be a mutual assent, because a literal 'meeting of the minds' is not required."); Comment to Wis JI—Civil 3010 ("Parties do not need to agree subjectively to the same interpretation at the time of contracting in order for there to be a mutual assent because a literal meeting of the minds is not required."). Rather, contract terms are usually "judged by an objective standard, looking to the express words the parties used in the contract." *Management Computer Servs.*, 206 Wis. 2d at 181.

> "It must be borne in mind that the office of judicial construction is not to make contracts or to reform them, but to determine what the parties contracted to do; not necessarily what they intended to agree to, but what, in a legal sense, they did agree to, as evidenced by the language they saw fit to use."

*Marion v. Orson's Camera Ctrs., Inc.*, 29 Wis. 2d 339, 345, 138 N.W.2d 733 (1966) (quoting *Wisconsin Marine & Fire Ins. Co. Bank v. Wilkin*, 95 Wis. 111, 115, 69 N.W. 354 (1897)).

¶ 21. Thus, the creation of an enforceable agreement is usually predicated on the language used in the contract and the *expressed* intentions of the parties. *See Shetney v. Shetney*, 49 Wis. 2d 26, 38–39, 181 N.W.2d 516 (1970) (" 'It is not enough that the parties think that they have made a contract; they must have expressed their intentions in a manner that is capable of

140

understanding. It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are.' " (quoting 1 CORBIN *Contracts* § 95, at 394)); *Goossen v. Estate of Standaert*, 189 Wis. 2d 237, 246, 525 N.W.2d 314 (Ct. App. 1994) ("Whether the parties reached the necessary agreement as to the term depends upon the parties' expression of intention.").

¶ 22. Interpreting Wisconsin law, the Seventh Circuit Court of Appeals has stated:

> Yet "intent" does not invite a tour through [a party's] cranium, with [that party] as the guide. Like most other states, Wisconsin takes an objective view of "intent." "The intent of the parties [to be bound] must necessarily be derived from a consideration of their words, written and oral, and their actions." *Household Utilities, Inc. v. Andrews Co.*, 71 Wis. 2d 17, 28–29, 236 N.W.2d 663, 669 (1976). Secret hopes and wishes count for nothing. The status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves.

*Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814–15 (7th Cir. 1987) (citation omitted).

¶ 23. For example, in *Gerruth Realty Co. v. Pire*, 17 Wis. 2d 89, 115 N.W.2d 557 (1962), the parties disputed the meaning of a contract term and the court concluded that evidence of one party's unexpressed subjective intent was not admissible because such evidence merely indicated "what [one party] had in mind at the time [of contracting and] it was not communicated to the [negotiator for the other party]." *Id.* at 95.

141

¶ 24. While the above cases can be read as providing support for French Corporation's argument that evidence of uncommunicated subjective belief of *one* party is generally not admissible to supply meaning to an ambiguous contract term, we need not fully explore that topic because we have a different situation. Here, there is evidence that negotiators on both sides held substantially the same uncommunicated belief regarding the meaning of an ambiguous contract phrase. To repeat, we have not found, and the parties have not produced, a case addressing this scenario. However, for the reasons set forth below, we conclude that when a contract term is ambiguous, a circuit court may admit evidence which, if believed, shows that the two negotiating parties agreed to the ambiguous term while independently possessing substantially the same understanding of the term, even though this understanding was not communicated.

¶ 25. We are guided here by the overarching principle that guides all contract interpretation: "The ultimate aim of all contract interpretation is to ascertain the intent of the parties." *Eden Stone Co.*, 166 Wis. 2d at 116. If two parties expressly agree to the use of an ambiguous contract phrase and subjectively agree on the meaning of that phrase, but neither communicates this subjective agreement to the other, we see no reason why their subjective agreement should not control. When the parties' uncommunicated subjective intents converge, the risks involved with delving into the minds of contracting parties with differing subjective views are not incurred. *See Skycom Corp.*, 813 F.2d at 815 ("If unilateral or secret intents could bind, parties would become wary, and the written word would lose some of its power."). When two parties hold substantially similar

subjective beliefs, neither party is held to the whims of the other. In fact, the parties obtain exactly the agreement for which they bargained.

¶ 26. Accordingly, the admissibility question for trial courts is whether the proffered evidence is sufficient to support a factual finding that the negotiating parties held substantially similar subjective beliefs regarding the ambiguous term.

¶ 27. At trial, Kernz testified that he included the phrase "just cause" in the contract because "I needed something where . . . [French Corporation] didn't have the option to terminate in the contract unless it was for some intentional wrongdoing." The French Corporation negotiator testified that "just cause to me would be if you intentionally do something." When the French Corporation negotiator was asked about his intent in agreeing to a "just cause" provision, he explained that he "was just basically following the outline of things that made just cause at [French Corporation] at that time, which would be fighting on company property, reporting under the influence of drugs or . . . theft, . . . those sorts of things that had already been outlined in the [employee] handbook." While Kernz and the French Corporation negotiator do not use identical phrasing, we conclude that a jury could find their interpretations of "just cause" to be substantially the same. Accordingly, we affirm admission of this extrinsic evidence of the meaning of "just cause."

*II. Whether the Stipulated Damages Clause Was an Enforceable Liquidated Damages Clause or an Unenforceable Penalty Provision*

¶ 28. The parties dispute whether the stipulated damages provision in the termination clause of the

143

employment contract is reasonable and, thus, an enforceable liquidated damages provision, or unreasonable and, thus, an unenforceable penalty provision. Following the terminology used in the seminal case on this topic, *Wassenaar v. Panos*, 111 Wis. 2d 518, 521, 331 N.W.2d 357 (1983), we use the term "stipulated damages" to mean the damages specified in the contract, and "liquidated damages" to mean reasonable and enforceable stipulated damages.

¶ 29. The review of a stipulated damages provision is a mixed question of law and fact. *Id.* at 525. Where, as here, the facts as found by the trial court are undisputed, only legal issues remain and our review is *de novo*.[2] *See Westhaven Assocs., Ltd. v. C.C. of Madison, Inc.*, 2002 WI App 230, ¶ 16, 257 Wis. 2d 789, 652 N.W.2d 819. Although the ultimate determination of reasonableness is a question of law, " 'because the trial court's legal conclusion . . . is so intertwined with the factual findings supporting that conclusion, the appellate court should give weight to the trial court's decision, although the trial court's decision is not controlling.' " *Id.* (quoting *Wassenaar*, 111 Wis. 2d at 525).

¶ 30. "A stipulated damages provision will be enforced if it is reasonable under the totality of the circumstances." *Westhaven*, 257 Wis. 2d 789, ¶ 17. The court looks at several factors to determine reasonable-

---

[2] French Corporation points to testimony which seemingly conflicts with some of the circuit court's findings, but the company does not argue that the circuit court's findings are clearly erroneous. We decline to develop this argument for French and then resolve the issue. *See State v. Pettit*, 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992) (stating that we may decline to review an issue inadequately briefed).

ness: "(1) Did the parties intend to provide for damages or for a penalty? (2) Is the injury caused by the breach one that is difficult or incapable of accurate estimation at the time of contract? and (3) Are the stipulated damages a reasonable forecast of the harm caused by the breach?" *Wassenaar*, 111 Wis. 2d at 529–30 (footnotes omitted). Essentially, we must look at both the "harm anticipated at the time of contract formation and the actual harm at the time of breach." *Id.* at 532. "The factors are not meant to be mechanically applied, and courts may give some factors greater weight than others." *Westhaven*, 257 Wis. 2d 789, ¶ 17.

¶ 31. Courts generally assume that "bargains are enforceable and that the party asking the court to intervene to invalidate a bargain should demonstrate the justice of his or her position." *Wassenaar*, 111 Wis. 2d at 526 (footnote omitted).

> [W]here neither party complains of inequity in bargaining power, the party seeking to avoid a stipulated damages provision bears both the "burden of proving facts which would justify the trial court's concluding that the clause should not be enforced" and the burden of persuading the court that the provision should not be enforced.

*Westhaven*, 257 Wis. 2d 789, ¶ 18 (quoting *Wassenaar*, 111 Wis. 2d at 526) (citation omitted). Here, neither party complains of inequity in bargaining power and, therefore, French Corporation, as the party seeking to avoid the application of the contract, bears the burden of persuading this court that the stipulated damages provision is unreasonable.

145

## A. *Intent of the Parties*

¶ 32. The first factor we examine when determining the reasonableness of a stipulated damages provision is whether the parties intended the provision to provide liquidated damages or, instead, to provide a penalty. As explained in *Koenings v. Joseph Schlitz Brewing Co.*, 126 Wis. 2d 349, 377 N.W.2d 593 (1985), this factor is "rarely helpful" because the parties' intent has "little relevance to what is reasonable in law." *Id.* at 362. Nevertheless, we examine this topic because "the parties' intent may have some evidentiary value." *Id.*

¶ 33. On the issue of intent, the trial court made a number of findings:

> Several factors forge the Court's decision in this regard. Among them are one, clearly, [Kernz] was looking for job security and advanced standing in his profession. Secondly, the parties were aware that the diecasting operation is tied to the automotive industry, an industry which business waxes and wanes and ebbs and flows. Thirdly, the parties certainly were aware that should downturns in business occur that it would be extremely difficult for [Kernz] to secure employment in the future let alone comparable employment without a formal education. Fourth, [Kernz] had recently been terminated by French about three months earlier after French acquired Nelson Metals. Fifth, [Kernz] obviously did not want to relocate.

¶ 34. Accordingly, to the extent we have factual findings regarding intent, those findings support the view that the parties intended to compensate Kernz for his reasonably anticipated but undeterminable damages rather than penalize French Corporation for breaching the agreement. However, for the reasons expressed in *Koenings*, we do not give this factor great weight in our consideration.

*B. Whether the Damages Were Ascertainable at the
Time of Contracting, and Whether the Stipulated
Damages Reasonably Forecast the Actual Damages*

¶ 35. In *Westhaven*, this court examined the second and third *Wassenaar* factors (whether the damages can be estimated at the time of contracting and whether the stipulated damages provisions are a reasonable forecast of the harm caused by the breach) and concluded that although both factors use a prospective-retrospective approach, "the fact remains that [these factors] require two distinct inquiries: the reasonableness of the stipulated damages provision at the time of contracting and the reasonableness of the provision when compared with actual damages after a breach." *Westhaven*, 257 Wis. 2d 789, ¶¶ 23–24. We will follow that same approach here.

¶ 36. Before addressing the merits of the parties' arguments, however, we detail the trial court's relevant factual findings on the second and third *Wassenaar* factors.

- Kernz suffered a loss of prestige in the industry.

- Kernz incurred relocation costs, including the costs of securing a new residence in Wisconsin.

- Kernz was not interested in relocating and had been "reasonably settled" in Florida.

- Kernz lost business opportunities as a result of the breach.

- "[A]t the time of the contract it's relatively easy to determine what the salary and the benefits were going to be under the agreement."

- "[A]t the time of trial looking back, it's very

147

difficult to ascertain the damages incurred by [Kernz] where he was forced to leave his home in Florida, where he was forced to relocate and purchase a new residence."

- "[T]he Court believes that the parties did include consequential damages at the time that the contract was reached."

- "The parties contemplated more than just insured salary for 3 years."

- "[T]he parties contemplated that [Kernz] would become a member of the Corporate Business Development Team," which "objectively is viewed as an elevation in rank."

- Kernz was required to seek new employment because of the breach.

### 1. Reasonableness of the Clause at the Time of Contracting

¶ 37. French Corporation argues that the clause is unreasonable because it was simple to calculate the compensation due Kernz under the contract. Therefore, according to French Corporation, Kernz's potential damages were readily ascertainable at the time of contracting. French Corporation also contends that calculations of Kernz's potential damages at the time of contracting should not include consequential damages because there is no evidence that the parties ever negotiated to compensate Kernz for consequential damages. As French Corporation states:

> [T]here is simply no evidence that [Kernz] and French [Corporation] contracted to provide for the protection of Kernz against any other damage besides those al-

148

lowed under the black letter rule. In other words, Kernz has not shown that he and French [Corporation] agreed that the stipulated damages clause was intended to protect him against so-called consequential damages.

¶ 38. First, French Corporation misperceives its burden. It is French Corporation that seeks to avoid imposition of the stipulated damages clause and, therefore, French Corporation has the burden to persuade this court that we should not enforce the stipulated damages provision. Kernz did not have to prove that the contract was intended to compensate him for consequential damages.

¶ 39. Second, to the extent French Corporation discusses the parties' intent in relation to the second *Wassenaar* factor, its argument is misplaced because evidence of the parties' intent is considered under the first *Wassenaar* factor.

¶ 40. Third, it is obvious that the parties contemplated Kernz's potential damages, including consequential damages, at the time of contracting, otherwise the contract would have followed "black letter law" and required Kernz to mitigate his damages and compensate him only for his out-of-pocket expenses. As in *Wassenaar*, the parties foresaw that Kernz might incur consequential damages, and contracted to compensate Kernz accordingly. *See Wassenaar*, 111 Wis. 2d at 536 ("The usual arguments against allowing recovery for consequential damages—that they are not foreseeable and that no dollar value can be set by a court—fail when the parties foresee the possibility of such harm and agree on an estimated amount.").

¶ 41. Assessing the reasonableness of this particular contract clause at the time of contracting is difficult. At the time of contracting, it was not known if or when French Corporation might terminate Kernz

without just cause, whether Kernz might secure new employment at a higher or lower salary, or what other damages Kernz might incur. Thus, the reasonableness of the clause seemingly depends on an unknown: the circumstances under which it would be invoked. To the extent the contract contemplates that if Kernz is terminated three weeks into the contract and promptly secures comparable new employment at a higher salary, the damages clause seems to be an unreasonable penalty clause. In contrast, termination after a longer time period, combined with a failure to find comparable employment, makes application of the clause much more reasonable. We conclude it makes little sense to void a damages clause because there are some possible scenarios that would produce punitive results while, at the same time, many other scenarios producing fair results. Accordingly, we give little weight to the reasonableness of this particular damages clause at the time of contracting.

### 2. Reasonableness of the Clause After the Breach

¶ 42. Next we address the reasonableness of the stipulated damages provision when compared with actual damages after the breach. *See Westhaven*, 257 Wis. 2d 789, ¶ 24.

¶ 43. French Corporation argues that Kernz will receive a "windfall" as a result of the stipulated damages provision. French Corporation alleges that Kernz "suffered [compensatory] damages of approximately $30,000.00 while the stipulated damage clause rewards Kernz $263,993.02," or "10 times [Kernz's] actual damage[s]," an amount that is "grossly disproportionate to [the compensatory] damage sustained." We disagree.

¶ 44. First, French Corporation's calculations are imprecise. Kernz was terminated on January 19, 2001.

He was unemployed for two months before he obtained a job that paid him $89,000 for eight months and then switched to another job that paid him $90,000. Under the French Corporation contract, Kernz was entitled to a $110,000 salary. According to French Corporation's brief, Kernz lost $30,000 in lost wages and benefits during the two months he did not work. However, over the next twenty-five months until the end of the contract, Kernz will likely suffer approximately $42,333.33 in lost wages, producing a total of approximately $72,333.33 in compensatory damages, rather than the $30,000 figure quoted by French Corporation.[3] $263,993.02 is 3.65 times greater than $72,333.33; a significant disparity, but far short of the "10 times" disparity alleged by French Corporation.

¶ 45. Second, the $72,333.33 figure does not include consequential damages suffered by Kernz. These damages are difficult to ascertain, *see Wassenaar*, 111 Wis. 2d at 537, and we will not attempt to put a dollar figure on Kernz's damages. However, the trial court found that Kernz suffered a loss of prestige in the industry; was required to seek new employment; incurred relocation costs, including the costs of securing a new residence; was "reasonably settled" in Florida; and lost business opportunities in Florida, all as a result of the breach. It is enough that Kernz's consequential damages, when added to his compensatory damages, could approximate the damages owed under the contract. Put another way, French Corporation presented no evidence that these consequential damages, when

[3] For purposes of this decision, we will assume Kernz will maintain the job paying $90,000 for the duration of the three-year term.

added to Kernz's compensatory damages, did not approximate the amount awarded under the contract.

¶ 46. In this case, French Corporation has the burden to demonstrate that the stipulated damages clause is unreasonable. Based upon the totality of the circumstances, we conclude that French Corporation has not met its burden.

### *Cross-Appeal*

¶ 47. Kernz argues that the trial court erroneously denied his request for pre-verdict interest because the amount awarded was determinable as of the date of the breach. "Whether preverdict interest may be awarded is a question of law. Preverdict interest is available when damages are fixed and determinable or may be measured according to a reasonably certain standard." *Loehrke v. Wanta Builders, Inc.*, 151 Wis. 2d 695, 706, 445 N.W.2d 717 (Ct. App. 1989) (citations omitted). "However, prejudgment interest will not be granted where the damages are determinable but 'some other factor' prevents the party from determining the amount that should be tendered." *City of Merrill v. Wenzel Bros., Inc.*, 88 Wis. 2d 676, 697, 277 N.W.2d 799 (1979). "A mere denial of liability is not a sufficient 'other factor.'" *Id*. We agree with Kernz that he is entitled to pre-verdict interest.

¶ 48. French Corporation argues that the damages in this case were undeterminable because it did not know whether it would succeed on its legal argument that the stipulated damages provision was an unenforceable penalty provision and, therefore, it could not calculate Kernz's potential damages. A similar argument was addressed and rejected in *Wenzel Brothers*, 88

Wis. 2d at 697. In *Wenzel Brothers*, the defendants disputed whether a statutorily mandated liquidated damages provision applied. *Id.* at 694. After concluding that the statute did apply, the court awarded prejudgment interest over the defendants' objection because the defendants disputed only their liability under the statutory liquidated damages provision; there was no dispute over the computation of damages. *Id.* at 698. As in *Wenzel Brothers*, French Corporation merely disputes its liability under the stipulated damages clause. The amount the company owed under the contract was easily calculable: salary and benefits for the remainder of the contract term.

¶ 49. French Corporation attempts to distinguish *Wenzel Brothers* from the instant case by arguing that *Wenzel Brothers* involved the applicability of a statutory liquidated damages provision rather than a dispute over the reasonableness of a stipulated damages clause. We think this is a distinction without a difference, and French Corporation does not persuade us otherwise.

### *Conclusion*

¶ 50. We affirm the judgment entered against French Corporation. We reverse the trial court's order denying Kernz's request for pre-verdict interest. Kernz contends that he is owed pre-verdict interest from January 19, 2001, the day French Corporation breached the contract, to November 19, 2001, the day he was tendered a settlement offer under Wis. Stat. § 807.01(4). French Corporation does not dispute this assessment and, therefore, we remand the cause to the trial court to enter an order consistent with this decision.

*By the Court.*—Judgment affirmed; order reversed and cause remanded with directions.