# William N. EHLINGER,
## Plaintiff-Respondent-Cross-Appellant,

v.

# Jon A. HAUSER and Evald Moulding, Inc.,
## Defendants-Appellants-Cross-Respondents.†

Court of Appeals

*No. 2007AP477. Submitted on briefs January 14, 2008.
—Decided July 24, 2008.*

## 2008 WI App 123

(Also reported in 758 N.W.2d 476.)

† Petition to review granted.

720

On behalf of the defendants-appellants-cross-respondents, the cause was submitted on the briefs of *Gary A. Ahrens, Daniel J. Vaccaro* and *Monica M. Riederer* of *Michael Best & Friedrich LLP*, Milwaukee, and *Kirsten L. Hauser* of Watertown.

On behalf of the plaintiff-respondent-cross-appellant, the cause was submitted on the briefs of *Timothy W. Feeley* and *Sara J. MacCarthy* of *Hall, Render, Killian, Heath & Lyman, P.C.*, Milwaukee.

Before Higginbotham, P.J., Vergeront and Bridge, JJ.

¶ 1 BRIDGE, J. This dispute centers on the disability buyout provisions of a Buy-Sell Agreement (Agreement) executed by Jon Hauser and William Ehlinger, the sole and equal shareholders of Evald Moulding Company (Evald). The circuit court ruled that Evald's shareholders were deadlocked, and ordered Evald's dissolution pursuant to WIS. STAT. § 180.1430 (2005–06).[1] However, the court determined that the judicial dissolution would be held in abeyance pending a determination by the court as to whether the disability buyout provisions in the Agreement, which Hauser invoked to buy out Ehlinger's shares, were enforceable. Thereafter the court ruled that they were not. In addition, the court ruled that Hauser was entitled to use Evald's assets to pay his costs of litigating this matter. The issues before us relate to the enforceability of the buyout provisions and the award of litigation costs to Hauser. We agree with the court's rulings on both of these issues and therefore affirm.

## FACTUAL BACKGROUND

¶ 2. This case involves a dispute between two former friends and business partners, Hauser and Ehlinger, each of whom own fifty-percent of the outstanding shares of the common stock of Evald Moulding Company, a picture frame manufacturing company. Hauser is Evald's President, Chief Executive Officer and Treasurer, and manages its day-to-day operations.

---

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

Ehlinger serves as Evald's Secretary.[2] The two also each own fifty-percent of the partnership interests in HE Partnership (Partnership).

¶ 3. In 1992, Ehlinger and Hauser entered into the Agreement, which provides in relevant part:

6. Purchase Price.

(a) For transfers of all of a Shareholder's stock at his death, or upon his becoming disabled, *the purchase price of a Shareholder's shares of stock shall be $350,000.00 or Book Value[,] whichever is greater,* except if the Shareholders have determined by unanimous resolution passed subsequent to the date of this agreement that the purchase price shall be other than $350,000.00, then the most recent such resolution shall determine the purchase price. For transfers of all of a Shareholder's stock on threat of involuntary transfer, the purchase price of a Shareholder's shares of stock shall be the book value of said shares as of the end of the last fiscal year. (Emphasis added.)

In May 1993, less than one year after the parties executed the Agreement, Ehlinger was diagnosed with Parkinson's disease.

¶ 4. In December 2000, Ehlinger asked Hauser to make him an offer to buy out his interests in Evald. Although the two did not reach an agreement at that time, they did agree that if a sale would evolve, the buyout would occur after Evald's fiscal year end in March 2001.

¶ 5. In June 2001, Hauser sent Ehlinger a letter invoking the disability buyout provisions of the Agreement, and offering to purchase Ehlinger's shares for $431,400, an amount Hauser claimed was based on

---

[2] It is unclear whether Ehlinger currently serves as Evalds corporate secretary.

Evald's "book value." Ehlinger requested and was given the opportunity to inspect Evald's books and records in order to verify the book value calculation. Ehlinger called an annual meeting of Evald's shareholders and directors on April 22, 2002, at which time he moved that Evald's books be audited by an independent certified public accountant acceptable to the two parties in order to determine the value of Evald and the Partnership. Hauser declined to second Ehlinger's motion. Thereafter, Evald conducted a closing of the purchase of Ehlinger's shares. Ehlinger refused to attend and refused to accept the buyout tender.

## PROCEDURAL HISTORY

¶ 6. Ehlinger filed suit against Hauser and Evald (collectively "appellants") seeking, among other things, a judicial dissolution of Evald. Ehlinger also sought declaratory relief that the buyout provisions in the Agreement were unenforceable for lack of essential terms, including the term "book value," which the Agreement neither defined nor specified a method of calculating. The complaint alleged that Ehlinger was not totally disabled so as to trigger the disability buyout provisions of the Agreement, and that certain actions on Hauser's part voided any alleged tender of a buyout. The complaint also alleged that the term "book value" was ambiguous, that determining the book value would be impossible due to the condition of Evald's books, and that discrepancies in Evald's financial statements rendered them misleading and unreliable.

¶ 7. Ehlinger moved for summary judgment declaring Hauser has no present rights under the Agreement. He also moved for summary judgment ordering the dissolution and liquidation of Evald due to shareholder deadlock and impasse. The appellants moved for

summary judgment declaring that Hauser validly exercised the disability buyout provisions.

¶ 8. The circuit court granted Ehlinger's request for dissolution and liquidation of Evald and the HE Partnership, ruling that it was undisputed that the shareholders had failed for at least two years to elect directors or successor directors, which constitutes grounds for judicial dissolution pursuant to WIS. STAT. § 180.1430(2)(c).[3] However, the court denied the parties' motions with regard to Hauser's right to exercise the Agreement's buyout provisions, which would serve as a contractual alternative to judicial dissolution, finding that material issues of fact remained in dispute. The court ruled that the dissolution and liquidation would be granted, pending resolution of the parties' dispute over whether the buyout provisions were enforceable. The court observed that if the appellants prevailed, Ehlinger's claim for dissolution would be moot, and if Ehlinger prevailed, final judgment of dissolution would be entered.

¶ 9. Following a trial to the court, the court ruled that Ehlinger was totally disabled as that term is defined in the Agreement, and for reasons not impor-

---

[3] WISCONSIN STAT. § 180.1430(2)(c) provides:

**180.1430 Grounds for judicial dissolution.** The circuit court for the county where the corporation's principal office . . . is or was last located may dissolve a corporation in a proceeding:

. . . .

(2) By a shareholder, if any of the following is established:

. . . .

(c) That the shareholders are deadlocked in voting power and have failed, for a period that includes at least 2 consecutive annual meeting dates, to elect successors to directors whose terms have expired or would have expired upon the election and, if necessary, qualification of their successors.

tant to our analysis, ruled that Ehlinger had failed to prove that the agreement was unenforceable. The remedy that the appellants sought was dismissal of the declaratory judgment action, apparently on the theory that following the court's rulings, all of the legal impediments to the buyout would have been removed. However, the court stated that it was unwilling to dismiss the action if there were any further contract terms relating to the buyout provisions, such as "book value," that required interpretation. Accordingly, the court entered an order dismissing Ehlinger's declaratory judgment action but, without objection by the parties, retained jurisdiction to determine the book value of Ehlinger's shares.

¶ 10. To ascertain the book value of Evald's stock, the court ruled that the book value would be determined from Evald's fiscal year ending March 31, 2001.[4] The court requested statements from the parties on the definition of book value and indicated that if the definitions were at variance, the court would hold a hearing on the issue. In their submission to the court, the appellants took the position that "book value equals assets less liabilities" and asserted that this calculation should be based on Evald's fiscal year 2001 financial statement, which was prepared by Hauser for purposes of preparing Evald's tax returns.

¶ 11. Ehlinger stipulated to the definition offered by Hauser's expert witness, but took the position that "[t]he issue is not the definition of 'book value,' but rather, is whether generally accepted accounting principles have been applied *correctly*, and whether they have been applied *consistently*." He contended that Hauser's preparation of the financial statements was "self-serving" and suspect. According to Ehlinger, the

---

[4] The parties do not challenge this ruling.

court should determine whether book value had been calculated according to generally accepted accounting principles (GAAP). In response, the appellants argued that Evald is a privately held, not a publicly traded, company, and that there were no internal or external requirements that its financial statements be prepared using GAAP. The appellants also argued that GAAP is not a "one size fits all" set of rigid rules, and questioned whether GAAP was an appropriate measure to be used instead of the system of accounts that Hauser had historically employed for Evald.

¶ 12. To assist the court in determining Evald's book value, the court appointed, without objection, a certified public accountant to serve as special magistrate. The court directed the special magistrate to determine Evald's book value "using generally accepted accounting principles which are appropriate for the size, function and structure of this corporation." The court's order provided further that "[t]he special magistrate will advise the Court of any departures from GAAP in his report to the Court. Finally, the special magistrate will report any substantial inconsistencies in the reporting methodology used by Evald in 2001 vis à vis the previous two years."

¶ 13. In the course of his inquiry, the special magistrate discovered the absence of certain supporting documentation underlying Evald's computer summaries which was needed to verify the computations that made up Evald's 2001 financial statement.[5] In one of his reports to the court,[6] the special magistrate stated as follows:

---

[5] Ehlinger does not contend that the absence of these records was intentional.

[6] The special magistrate submitted a total of three reports which were dated March 7, 2006, May 8, 2006, and June 28, 2006.

We have verified that all of the items on Evald's balance sheet have been recorded in accordance with GAAP for F/Y/E 3/31/01 except the following items. Evald has stated that they are not able to provide the information needed to verify items 1 through 5 because their computer software summarizes data and the information for the F/Y/E 3/31/01 is not retrievable.

(1) Physical inventory

(2) Accounts receivable and invoice cutoff procedures

(3) Accounts payable and cutoff procedures

(4) The use of PO clearing account

(5) The use of IC clearing account

(6) Depreciation according to GAAP

(7) Minutes of corporate meeting

. . . .

Since the value of the business is based on the balance sheet, it is necessary to have back up documents to support the numbers reported on the balance sheet. According to the Practitioners Publishing Company, a regular accounting practice in the State of Wisconsin ought to keep back up documents and records for a minimum of 6 years . . . . Without verification of the aforementioned[,] we cannot confirm that the items mentioned above, which are presented on Evald's balance sheet are generated in accordance to Generally Accepted Accounting Principles.

During a hearing, the special magistrate testified that as a result of the missing documentation, he was unable to offer an opinion as to Evald's book value for the fiscal year ending March 31, 2001, to a reasonable degree of accounting certainty.

¶ 14. After evidence was taken by the court on the definition of book value, Ehlinger moved the court for reconsideration of its earlier orders dismissing Ehlinger's action for declaratory judgment. Ehlinger argued that the special magistrate concluded that book value could not be determined; consequently, under the terms of the agreement, Evald's buyout tender was void because the correct book value was not tendered. Ehlinger further argued that Hauser's failure to retain documents sufficient to verify Evald's balance sheet was a violation of Hauser's fiduciary duties. Ehlinger argued that because the buyout tender was unenforceable, dissolution of Evald was appropriate.

¶ 15. The circuit court granted Ehlinger's motion for reconsideration in an order dated November 29, 2006. The circuit court observed that as the special magistrate made his inquiry, "it became clear that the parties' contractual term was too vague to cure. 'Book value' could mean anything from simple adoption of the year end statement to an audited determination." The court ruled that although during their December 2000 meeting, Ehlinger and Hauser discussed waiting for the year end statement, any inference that this discussion ratified the appellants' definition of book value was vitiated by the parties' agreement to have Ehlinger review the books thereafter. The court concluded that "[t]he parties' conduct is insufficient to give definite meaning to the vague term" and, on this rationale, granted Ehlinger's motion to declare "book value" un-determinable. Hauser moved for reconsideration of the court's order, which was denied. The court then entered a final judgment dissolving and liquidating Evald and the Partnership.

¶ 16. The appellants appeal this judgment and Ehlinger cross-appeals several issues related to the

circuit court's determination regarding the enforceability of the Agreement, as well as the court's determination that Hauser was entitled to use Evald's assets to pay his costs of litigating this matter. The circuit court stayed judgment pending appeal. We reference additional facts as needed in the discussion below.

## DISCUSSION

¶ 17. We begin by noting that the appellants do not challenge the circuit court's finding that Evald's shareholders were deadlocked in voting power or the court's order dissolving Evald and the HE Partnership pursuant to WIS. STAT. § 180.1430. Instead, the appellants argue that Hauser properly invoked the disability buyout provisions of the Agreement, and thus, Ehlinger must sell his shares to Hauser as a contractual alternative to judicial dissolution. In other words, the appellants confine their arguments to whether the buyout provisions are enforceable and do not contend that dissolution is inappropriate if they are not. We therefore focus our analysis on the enforceability of the buyout provisions.

*Whether Ehlinger Was "Totally Disabled"
Within the Meaning of the Agreement*

¶ 18. We begin with Ehlinger's assertion on cross-appeal that he was not "totally disabled" within the meaning of Section 3 of the Agreement. If Ehlinger was not totally disabled under the terms of the Agreement, the buyout provisions of the Agreement were not triggered, and it is unnecessary to address the majority of the remaining issues before us.

¶ 19. The interpretation of a contract is a question of law which we review de novo. *Kasten v. Doral*

732

*Dental USA, LLC,* 2007 WI 76, ¶ 19, 301 Wis. 2d 598, 733 N.W.2d 300. "When the terms of a contract are plain and unambiguous, we will construe the contract as it stands." *Tang v. C.A.R.S. Protection Plus, Inc.* 2007 WI App 134, ¶ 29, 301 Wis. 2d 752, 734 N.W.2d 169.

■

¶ 20. Section 3 of the Agreement defines "totally disabled" as "being unable to perform all the substantial and material duties of his employment with Evald Moulding Company, Inc.; or of the occupation or profession he practiced on the date he became disabled." Ehlinger contends that the "undisputed facts" establish that he was not totally disabled from the practice of dentistry or any other profession within the meaning of the Buy-Sell Agreement. We disagree. Certain underlying facts necessary to the legal determination of total disability were in dispute and the circuit court made findings adverse to Ehlinger. We will not set aside findings of fact unless they are clearly erroneous, *see* WIS. STAT. § 805.17(2), and we conclude that the circuit court did not err when it made the following findings.

¶ 21. Ehlinger practiced dentistry beginning in 1970. As noted above, he was diagnosed with Parkinson's disease in May 1993. Based on testimony by Ehlinger's partner in the dentistry practice, the circuit court found that "quite suddenly" near Thanksgiving of 1993, Ehlinger proposed to sell his interest in the dentistry practice. On approximately December 1, 1993, Ehlinger advised his patients by letter that, effective December 31, 1993, he would be taking a leave of absence from dentistry in order to pursue treatment for Parkinson's disease. The court also found that although the December 1993 departure was titled as a leave of absence, there was no contractual provision in place for Ehlinger's return to the practice. The court stated that

"[w]hile it appears that the dentists hoped for Dr. Ehlinger's return, it was not expected." Ehlinger continued to work at the dental office on a limited basis into the second quarter of 1994, but performed only two duties: supervising the hygienist, and performing oral examinations after teeth cleaning.

¶ 22. Ehlinger sought a declaration from the Social Security Administration that he was disabled from the practice of dentistry as of March 15, 1994.[7] As the circuit court observed:

> It was Dr. Ehlinger who had both variables in the equation: He knew what it took to practice dentistry, and he knew how the Parkinson's disease affected his ability to perform the jobs needed in that profession. And with those two pieces of evidence, better known to Dr. Ehlinger than anyone else, he declared that he was disabled . . . .

¶ 23. Ehlinger argued unsuccessfully that his Social Security application should be discounted. Ehlinger argued before the circuit court and contends on appeal that even though he ceased actively treating patients as of January 1, 1994, he remained fully capable of performing all of the duties of the profession of dentistry. However, the circuit court gave little weight to Ehlinger's testimony on this issue. In its ruling dated September 9, 2005, the court observed that, in addition to short and long term memory loss and poor stamina, Ehlinger "displayed substantial loss of large muscle control during

---

[7] Ehlinger's application was first denied and then ultimately approved in 1996, at which time the Social Security Administration deemed Ehlinger disabled as of October 5, 1995. The circuit court noted that it was Ehlinger who was in a better position to determine his disabilities as of March 15, 1994, than the Social Security representative who denied his initial claim. We agree.

his testimony" in proceedings before the court. The court noted that its own observations were inconsistent with Ehlinger's testimony regarding the exquisite hand/eye control and other skills needed to perform dentistry. Thus, the court determined that it would "not give substantial weight to the testimony from Dr. Ehlinger that he was not disabled from the practice of dentistry in 1993 or '94." The weight and credibility to be given to testimony is within the province of the circuit court. *Siker v. Siker,* 225 Wis. 2d 522, 528, 593 N.W.2d 830 (Ct. App. 1999). The circuit court was in the best position to assess Ehlinger's physical condition and his ability to engage in the motor coordination needed to engage in all of the duties necessary to practice dentistry.

¶ 24. Ehlinger also contends that although the progressive course of Parkinson's disease eventually rendered him unable to practice dentistry, this was long after he had abandoned dentistry and embarked on another occupation. In particular, Ehlinger points to the fact that he became involved in other pursuits such as becoming co-owner and president of the Watertown Athletic Club and organizing the Health and Wellness Center of Watertown, Inc. However, as discussed above, Ehlinger was disabled from the practice of dentistry prior to the time he pursued these business opportunities and, in any event, Ehlinger's "occupation or profession" at the time he became disabled was plainly dentistry, not organizing recreational facilities.

¶ 25. For the above reasons, we conclude that the circuit court did not err when it made the predicate factual findings in support of its determination that Ehlinger was "totally disabled" from the practice of dentistry within the meaning of the Agreement as of March 15, 1994.

*Unenforceability of Agreement Due to Ambiguity
and Indefiniteness of the term "Book Value"*

¶ 26. Broadly speaking, the appellants contend that the circuit court erred when it determined that the Agreement is unenforceable because the term "book value" is not only ambiguous, but also indefinite. The appellants set forth a number of arguments in support of these contentions which we address in turn.

¶ 27. Whether the terms of a written contract are ambiguous is a question of law which we review de novo. *See Wisconsin Label Corp. v. Northbrook Prop. Cas. Ins. Co.,* 2000 WI 26, 24, 233 Wis. 2d 314, 607 N.W.2d 276. A contract provision is ambiguous when it is reasonably and fairly susceptible to more than one construction. *Jones v. Jenkins,* 88 Wis. 2d 712, 722, 277 N.W.2d 815 (1979).

¶ 28. "A contract must be definite and certain as to its basic terms and requirements to be enforceable." *Metropolitan Ventures, LLC v. GEA Assocs.,* 2006 WI 71, ¶ 22, 291 Wis. 2d 393, 717 N.W.2d 58. Indefiniteness means that an essential term of the agreement is so vague or indefinite that that agreement is not "definite as to the parties' basic commitments and obligations," thus preventing the formation of a contract. *See Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.,* 206 Wis. 2d 158, 178, 557 N.W.2d 67 (1996). The issue of indefiniteness goes to contract formation because the indefiniteness of an essential term prevents the creation of an enforceable contract. *Metropolitan Ventures,* 291 Wis. 2d at 408 n.9. Ambiguity and indefiniteness are not synonymous; whereas ambiguity in itself does not render a contract unenforceable, indefi-

niteness does. *See Management Computer Servs.*, 206 Wis. 2d at 178–80.

¶ 29. For purposes of this appeal, we will assume without deciding that the standard of review as to whether a contract is too indefinite to be enforceable is de novo. *Compare Management Computer Servs.*, 206 Wis. 2d at 178 (indefiniteness may be a question of fact or law), *and Metropolitan Ventures*, 291 Wis. 2d 393, ¶ 22 (indefiniteness is a question of law).

¶ 30. We begin by observing that the absence of the detail documentation underlying the 2001 financial statement did not render the Agreement indefinite. Indefiniteness goes to whether the terms of an agreement are so vague *at the time the agreement is entered into* that they prevent the formation of a contract. *See Management Computer Servs.*, 206 Wis. 2d at 178. The parties did not become aware of the missing documentation until many years after they executed the Agreement. We conclude that the use of the term "book value" did not render the Agreement so vague as to be indefinite; rather it created an ambiguity in how the term "book value" would be calculated. *See Schumann v. Samuels*, 31 Wis. 2d 373, 376–77, 142 N.W.2d 777 (1966) (absent a specific definition in a written agreement, "book value" is an ambiguous term).

¶ 31. The circuit court resolved the ambiguity by determining that book value would be calculated using GAAP rather than by simply accepting the calculation used by Hauser in preparing Evald's 2001 financial statement. It is reasonable to infer that at the time the parties entered into the Agreement in 1992, they contemplated that "book value" for purposes of a shareholder buyout would be calculated through the use of

generally accepted accounting principles rather than through the use of financial statements for Evald that Hauser would later develop over the ensuing years. We are satisfied that the court's ruling was the more reasonable construction of the term.

¶ 32. The appellants next argue that after determining that the term book value was ambiguous, the circuit court should have conducted a trial and looked to extrinsic evidence to determine the parties intent with regard to the definition of book value. *See, e.g., Moran v. Shern,* 60 Wis. 2d 39, 47, 208 N.W.2d 348 (1973) (if a contract is ambiguous, evidence extrinsic to the contract may be used to determine the parties' intent). The appellants rely on *Kernz v. J.L. French Corp.,* 2003 WI App 140, ¶¶ 8–27, 266 Wis. 2d 124, 667 N.W.2d 751, wherein admissible extrinsic evidence used to determine intent included the surrounding circumstances, including factors occurring before and after the signing of an agreement. They assert that at trial they would have introduced evidence that at the December 15, 2000 meeting, Hauser and Ehlinger agreed that Hauser would purchase Ehlinger's shares after the completion of the 2001 financial statement, and that the two men did not prescribe a manner for preparing the 2001 financial statement that differed from prior years. From this, the appellants conclude that "both parties must have intended to follow the historical practice of Evald." We are not persuaded.

¶ 33. Even if the appellants were to have offered the evidence they wished to offer, it would not have resolved the ambiguity. Merely because Hauser and Ehlinger agreed to wait until after Evald's 2001 fiscal year does not necessarily mean that they agreed to simply accept the figures from the 2001 financial statement to compute book value. In addition, even assum-

ing for purposes of argument that Ehlinger was willing to accept Hauser's "historical practice" in preparing Evald's financial statement, it does not necessarily follow that Ehlinger would be required to accept the 2001 financial statement on its face without an opportunity to determine if it was calculated in a manner that was consistent with prior years and, thus, with "historical practice." As the circuit court correctly determined, the fact that the parties agreed that Ehlinger could independently review Evald's records following the completion of the 2001 fiscal year vitiates the conclusion that the appellants urge.

¶ 34. The appellants next argue that even if the available extrinsic evidence would not have provided the definition of "book value," the circuit court should have used the following definition provided in *Townsend v. La Crosse Trailer Corp.*, 254 Wis. 31, 36, 35 N.W.2d 325 (1948): "[t]he book value is not any arbitrary value that may be entered upon the books of the company but the value as predicated upon the market value of the assets of the company after deducting its liabilities." However, we fail to see how this definition resolves the present dispute. The dispute centers on how "assets minus liabilities" should be calculated and, for the reasons discussed above, we have concluded that the use of GAAP was appropriate. .

■■

¶ 35. The appellants also contend that the special magistrate testified that book value could be determined from Evald's 2001 financial statement and calculated a book value of $889,924.64 using GAAP, after adjusting for a different treatment for depreciation. Thus, the appellants argue that the circuit court should simply have adopted this figure. As Ehlinger points out, however, the special magistrate qualified this calcula-

tion of book value by testifying that it was based on representations by Evald's management. In other words, the validity of this figure depended on Hauser's calculation of the 2001 financial statement without the benefit of the missing supporting documentation. As discussed above, we are satisfied that the use of GAAP, rather than the use of Hauser's calculations, is the more reasonable construction of "book value." In addition, the supporting documentation was a necessary component of a valid GAAP computation. We therefore reject this argument.[8]

¶ 36. We next turn to the implications of the missing documentation. The appellants contend that the circuit court could not draw from the absence of the supporting documentation an adverse inference that the missing records disfavored the calculation of book value based on the 2001 financial statement. Citing *Garfoot v. Fireman's Fund Ins. Co.*, 228 Wis. 2d 707, 718–19, 599 N.W.2d 411 (Ct. App. 1999), the appellants argue that such an adverse inference is an appropriate remedy for spoliation of evidence, but because no spoliation occurred in the present case, the adverse inference should not be drawn.

¶ 37. However, the appellants offer no support in the record for the proposition that the court drew an adverse inference against them. The circuit court neither used the term adverse inference nor specifically imposed a sanction against appellants due to the missing documentation. Instead, the court determined that the documentation necessary to a computation of book

---

[8] For the same reasons, we reject the appellants' argument that the special magistrate need not "verify" Evald's financial statements because verification was outside of his assignment and he could ascertain book value based on representations of Evald's management using a "compilation" methodology.

value according to GAAP was no longer available, and therefore the GAAP computation could not be properly completed. Accordingly, we reject this argument as well.[9]

¶ 38. The appellants also recast the above arguments to suggest that the circuit court improperly permitted Ehlinger to resurrect his argument regarding how to compute Evald's book value after Ehlinger had abandoned it. In particular, the appellants assert that Ehlinger's expert report contained no suggestion that Ehlinger would assert at trial that Evald's records were insufficient to calculate book value based on other missing documentation, and that at his deposition, Ehlinger stated that he had no knowledge that the 2001 financial statement book value was incorrect. The appellants contend that they had a right to rely on Ehlinger's failure to present this issue. They argue that the circuit court's decision to allow Ehlinger to raise this issue "was akin to a decision to permit amendment of the pleadings in 2006 to add back an issue Ehlinger had dropped in 2002." Citing *State v. Peterson*, 104 Wis. 2d 616, 634–35, 639–40, 312 N.W.2d 784 (1981), the appellants contend that while a trial court has the power to permit amendment of the pleadings, it errs if it does not grant an opportunity for parties to present additional evidence to insure that they have a full opportunity to be heard on the issues litigated.

¶ 39. As Ehlinger points out, however, he had always alleged that Evald's book value was undeterminable. In his complaint, Ehlinger alleged that the Agree-

---

[9] For the same reasons, we likewise reject the appellants' argument that the circuit court improperly shifted the burden of proof with respect to the missing documentation.

ment was unenforceable for lack of essential terms, including, among other things, that the Agreement contained no definition of "book value" or how it should be calculated. Additionally, he alleged that the manner in which Hauser kept the books made it impossible to calculate book value. Ehlinger's pretrial submissions required by the scheduling order also included several proposed findings of fact relating to the methodology for computing the value of Evald's shares. We conclude that Ehlinger did not abandon his argument regarding the methodology used to compute the value of Evald's shares.

■

¶ 40. The appellants next argue that the circuit court erred in granting Ehlinger's motion for reconsideration because Ehlinger did not present any newly discovered evidence and did not establish a manifest error of law or fact. We disagree. Although Ehlinger's motion was stylized as a motion for reconsideration and was described as such by the circuit court, the court's ruling with regard to Ehlinger's motion was not a reconsideration of a prior determination. Rather, it was a new ruling on a continuing issue before the court, namely, the fact that book value could not be ascertained using GAAP in light of the missing documentation. We therefore reject this argument.

¶ 41. Finally, the appellants argue that the circuit court improperly denied them an opportunity to depose or cross-examine the special magistrate[10] or to call an expert witness in rebuttal. They contend that, pursuant to *State v. Peters*, 192 Wis. 2d 674, 687–88, 534 N.W.2d 867 (Ct. App 1995), cross-examination of expert wit-

[10] Appellants contend that they were permitted "some, but not complete," cross-examination of the special magistrate.

nesses is permitted in order to test the underlying theory or principle on which admissibility of the expert's testimony is based. They also argue that fundamental fairness demanded the presentation of opposing expert evidence by their own witness.

¶ 42. The problem with the appellants' argument is that it is based on the premise that the special magistrate was an expert witness. He was not. The circuit court expressly ruled:

> Regarding calling the special magistrate as witness, I didn't talk to Mr. Chmielewski about this, but I would allow either of you to question him regarding just a couple of things which are essentially clarification of his reports. One is any arithmetical calculation he's made; two is what, what sources he had as a base to the figures that he used; and third, the opinions that he made in his report to the Court. He's not anybody's expert witness; but I would, if you have questions just on those aspects of his report, allow him to testify.

We conclude that the circuit court did not treat the special magistrate as an expert witness under WIS. STAT. § 906.14,[11] and that the parties were not entitled to cross-examine him. The fact that the court permitted any cross-examination at all was a matter within the circuit court's discretion. *See, e.g., State v. Lindh*, 161 Wis. 2d 324, 348, 468 N.W.2d 168 (1991). If the circuit court has "examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion," we will affirm the court's exercise of discretion. *Martindale v.*

---

[11] WISCONSIN STAT. § 906.14(1) provides that: "[t]he judge may, on the judge's own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called."

743

*Ripp,* 2001 WI 113, ¶ 28, 246 Wis. 2d 67, 629 N.W.2d 698. We conclude that the circuit court did all of the above and, therefore, reject the appellants' argument.

¶ 43. For the above reasons, we conclude that the term "book value" as used in the Agreement is not indefinite but is ambiguous, and that the most reasonable construction of that term is that it refers to a computation using generally accepted accounting principles. We conclude further that the absence of information necessary to complete the GAAP analysis rendered the disability buyout provisions unenforceable because Evald's book value as of March 31, 2001, could not be determined.

*Hauser's Use of Evald's Corporate Assets
to Defend Against Ehlinger's Lawsuit*

¶ 44. On cross-appeal, Ehlinger challenges the circuit court's ruling that Evald's assets could be used to pay attorneys' fees incurred in this matter. The circuit court's determination that corporate funds could be used for this purpose was equitable in nature, and the circuit court had broad discretion in achieving a fair accounting between the parties. *See Gull v. Van Epps,* 185 Wis. 2d 609, 626–27, 517 N.W.2d 531 (Ct. App. 1994) (dissolution of a partnership and the liquidation of its affairs is a proceeding in equity). We will uphold the circuit court's exercise of discretion if it "examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, arrived at a conclusion that a reasonable judge could reach." *DeWitt Ross & Stevens, S.C. v. Galaxy Gaming and Racing Ltd. P'ship,* 2004 WI 92, ¶ 21, 273 Wis. 2d 577, 682 N.W.2d 839.

¶ 45. Ehlinger complains that he funded the prosecution of this case out of his own personal funds, while

Hauser "use[d] Evald's coffers to pay the costs and expenses of his personal legal representation in this litigation." Although he concedes that no Wisconsin court has directly addressed this issue, Ehlinger asserts that at least one other court has held that when a corporation appears as a nominal party and the proceeding amounts to a dispute between the shareholders, corporate funds may not be used to pay attorneys' fees for the individual shareholders. *See Petition of Levitt,* 109 A.D.2d 502, 511 (N.Y.A.D. 1985).

¶ 46. In response, the appellants point out that Ehlinger named Evald as a defendant in the action along with Hauser, and the circuit court affirmatively determined that Evald is not a nominal party and has a vested interest in the outcome of this litigation. We agree that Evald is not a nominal party. Indeed, the relief Ehlinger sought, and the relief granted by the circuit court, was the dissolution of Evald, which employs approximately thirty people.

¶ 47. In addition, WIS. STAT. § 180.0851 provides that an officer or director of a corporation is entitled to indemnification for liability for acts undertaken in his or her capacity as an officer or director.[12] Ehlinger

---

[12] WISCONSIN STAT. § 180.0851 provides in relevant part:

(1) A corporation shall indemnify a director or officer, to the extent that he or she has been successful on the merits or otherwise in the defense of a proceeding, for all reasonable expenses incurred in the proceeding if the director or officer was a party because he or she is a director or officer of the corporation.

(2)(a) In cases not included under sub. (1), a corporation shall indemnify a director or officer against liability incurred by the director or officer in a proceeding to which the director or officer was a party because he or she is a director or officer of the

contends that the dispute does not involve either party's status as a director or officer of Evald, and is instead a dispute solely between equal shareholders. We are not persuaded. Although the litigation was postured in that fashion at its onset, during the course of the proceedings the dispute focused on Hauser's actions as the individual responsible for the preparation of Evald's corporate books and financial statements, and also for the retention of the records that supported the data in the financial statements. We conclude that, in addition to the fact that Evald was not a nominal party to the lawsuit, payment of Hauser's litigation expenses with corporate funds is justified under § 180.0851.

¶ 48. Ehlinger argues that even if Hauser was entitled to reimbursement under Wis. Stat. § 180.0851, Hauser has not followed mandatory statutory procedures. Ehlinger contends that under Wis. Stat. § 180.0855, because Evald's bylaws do not provide otherwise, Hauser was entitled to reimbursement only by majority vote of the directors, by the decision of independent legal counsel picked by the directors, by decision of three arbitrators, by affirmative vote of the corporation's shares, or by court order.[13] Ehlinger argues that none of

corporation, unless liability was incurred because the director or officer breached or failed to perform a duty that he or she owes to the corporation and the breach or failure to perform constitutes any of the following:

1. A willful failure to deal fairly with the corporation or its shareholders in connection with a matter in which the director or officer has a material conflict of interest.

. . . .

3. A transaction from which the director or officer derived an improper personal profit.

4. Willful misconduct.

[13] Wisconsin Stat. § 180.0855 provides as follows:

these scenarios is present in this case. That assertion overlooks the fact that, consistent with the provisions of WIS. STAT. § 180.0854, the circuit court did in fact order that Hauser be indemnified; thus Hauser has complied with subsection 5 of § 180.0855. Accordingly, we conclude that the circuit court did not err in its

**Determination of right to indemnification.** Unless otherwise provided by the articles of incorporation or bylaws or by written agreement between the director or officer and the corporation, the director or officer seeking indemnification under *s. 180.0851(2)* shall select one of the following means for determining his or her right to indemnification:

(1) By a majority vote of a quorum of the board of directors consisting of directors who are not at the time parties to the same or related proceedings. If a quorum of disinterested directors cannot be obtained, by majority vote of a committee duly appointed by the board of directors and consisting solely of 2 or more directors who are not at the time parties to the same or related proceedings. Directors who are parties to the same or related proceedings may participate in the designation of members of the committee.

(2) By independent legal counsel selected by a quorum of the board of directors or its committee in the manner prescribed in sub. (1) or, if unable to obtain such a quorum or committee, by a majority vote of the full board of directors, including directors who are parties to the same or related proceedings.

(3) By a panel of 3 arbitrators consisting of one arbitrator selected by those directors entitled under sub. (2) to select independent legal counsel, one arbitrator selected by the director or officer seeking indemnification and one arbitrator selected by the 2 arbitrators previously selected.

(4) By an affirmative vote of shares as provided in *s. 180.0725.* Shares owned by, or voted under the control of, persons who are at the time parties to the same or related proceedings, whether as plaintiffs or defendants or in any other capacity, may not be voted in making the determination.

(5) By a court under *s. 180.0854.*

(6) By any other method provided for in any additional right to indemnification permitted under *s. 180.0858.*

747

determination that Evald's assets could be used by Hauser to defend against this lawsuit.

## CONCLUSION

¶ 49. For the reasons discussed above, we conclude that Ehlinger was "totally disabled" within the meaning of the disability buyout provisions of the Agreement. We conclude further that the disability buyout provisions are unenforceable. Finally, we conclude that the circuit court properly exercised its equitable discretion when it determined that Hauser's litigation expenses in this matter should be paid by Evald. Because these issues are dispositive, we do not reach the parties' remaining arguments. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (if a decision on one point disposes of the appeal, we will not decide the other issues).

*By the Court.*—Judgment affirmed.